**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com

*Attorneys for Plaintiffs and Co-Lead*
*Counsel for the Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HAU XIANG LEONG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CAPRICOR THERAPEUTICS, INC. and LINDA MARBÁN,<br><br>Defendants. | Case No. 3:25-cv-01815-GPC-AHG<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiffs Maximilian Laserer and Moussa Yeroushalmi ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their undersigned attorneys, allege in this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Capricor Therapeutics, Inc. ("Capricor" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Capricor's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews with former employees of Capricor; and (e) information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action brought on behalf of all persons and entities who purchased or otherwise acquired Capricor securities between September 24, 2024 and July 10, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' (defined below) violations of the federal securities laws (the "Class").

2.    Capricor is a clinical-stage biotechnology company that engages in the development of transformative cell- and exosome-based therapeutics. Since its inception, Capricor has focused on the development and commercialization of its lead product candidate, CAP-1002, later known as Deramiocel, which is biologic pharmaceutical comprised of allogeneic cardiosphere-derived cells ("CDCs"), for

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the treatment of Duchenne muscular dystrophy ("DMD") and other related indications with unmet medical needs in the United States.

3.    Biopharmaceutical companies must obtain permission from the U.S. Food & Drug Administration ("FDA") before selling a drug to the public. To obtain this permission, companies need to prove that their drug is both safe and effective through a series of clinical tests performed under strict guidelines and industry standards. This process ensures that patients receive a product that provides the benefits it purports to, that they are protected from dangerous treatments, and that the benefits of the product outweigh its risks. The FDA is prohibited from approving any application to license a product in the U.S. without substantial evidence that the product is "safe, pure, and potent." 42 U.S.C. § 262(a)(2)(C)(i)(I).

4.    In addition to sufficient evidence that the product is safe and effective, companies need to prove that the product's proposed labeling is appropriate and that the methods used in manufacturing the product and the controls used to maintain the product's quality are adequate to preserve its identity, strength, quality, and purity. This process ensures that the quality of the product, manufactured on a commercial scale, meets appropriate standards, is consistent, and is the same as that described on the label. The FDA is prohibited from approving any licensing application without proof that a product is manufactured in compliance with Current Good Manufacturing Practices ("cGMP"). 21 C.F.R. § 601.2(d).

5.    Consequently, biopharmaceutical companies like Capricor risk severe penalties and sanctions when they fail to comply with the rules and regulations around establishing sufficient evidence of safety and effectiveness and meeting all chemistry, manufacturing, and control ("CMC") requirements as outlined by the FDA, such as rejection of applications for marketing approval, civil fines, and even criminal penalties.

6.      The fallout from a botched application submission can also have staggering implications for investors. Licensing applications to the FDA are confidential under federal regulations, leaving investors wholly dependent on a company's candor when determining whether to invest. Accordingly, when investors buy stock in biopharmaceutical companies, they do so based on the information contained in the company's public statements, presentations, and SEC filings. If a biopharmaceutical company misleads investors about the strength of its clinical development program designed to support marketing approval, the status of its application, or the risks it currently faces, then investors are not given a fair opportunity to make an informed decision and, accordingly, end up being wrongly deprived of the full disclosure they deserve under the federal securities laws.

7.      This is unfortunately what happened to Plaintiffs and the other members of the Class. Pursuant to multiple priority designations issued to CAP-1002 by the FDA, as a drug intended to treat a rare pediatric disease, Capricor leadership, including Chief Executive Officer ("CEO"), Defendant Linda Marbán, frequently communicated directly with agency staff, and attended numerous formal and informal meetings with FDA to discuss the regulatory approval pathway for CAP-1002, beginning with the design of its clinical development program to the submission of an application for marketing approval.

8.      On September 24, 2024, Defendants declared that, "after working diligently with FDA through the course of 2024, we have decided to derisk our path forward by" filing a Biologics License Application ("BLA") seeking full approval of CAP-1002 for the proposed indication of DMD-associated cardiomyopathy without any clinical data from Capricor's then-ongoing pivotal Phase III trial, based instead only on existing clinical data from Capricor's Phase II clinical trial and real world data from its related Open Label Extension ("OLE") study compared to

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

natural history data provided by Vanderbilt University Medical Center and Cincinnati Children's Hospital Medical Center.

9.    Defendants knew that this move did not "derisk" the path forward but rather increased regulatory risk. Unbeknownst to investors, the FDA had privately advised Capricor that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III clinical data. Such guidance was based on the FDA's longstanding position that Capricor's Phase II trial for CAP-1002 was designed as an exploratory clinical trial, and as completed, the test population was too small to provide an adequate basis for physician labeling. Worse yet, for years, the FDA raised concerns about the Phase II clinical data reported by Capricor, which initially failed to meet its efficacy endpoint but was later deemed statistically significant in a *post hoc* analysis.

10.    Because Capricor resolved to submitting a BLA supported only by less than reliable efficacy data from a single small-scale, exploratory clinical trial, substantiated by real world data from an unblinded, single-arm OLE study only later compared to external natural history data that was also intended to serve as independent confirmatory evidence, the application lacked substantial evidence of effectiveness, as statutorily required to support marketing approval in the U.S. Refusing to heed the FDA's advice imperiled Capricor's BLA.

11.    To make matters worse, Capricor's San Diego facility, responsible for manufacturing CAP-1002 upon potential product approval, was not compliant with cGMP. As detailed by multiple former employees of Capricor, at the time of the BLA submission, there was widespread concern within the Company that the application would be rejected because of rampant and unresolved CMC deficiencies. Such problems spanned from a contamination-prone facility layout to weak data controls to a deficient and incomplete quality control system.

12.     Throughout the Class Period, Defendants issued materially false and misleading statements to investors concerning the strength of Capricor's efficacy data submitted in the BLA, the readiness of its San Diego manufacturing facility and its compliance with applicable cGMP requirements, the status of the application submitted, and the risks associated therewith. For example, on November 13, 2024, Defendant Marbán again offered assurances of Capricor's chosen path of seeking approval without pivotal Phase III clinical data, calling it a "clear strategy" and declaring that "the [existing] data has shown clinically meaningful as well as statistically significant improvements. Based on the strength of the data as well as the large unmet medical need of the cardiac implications, we have decided after conferring with the FDA to file a BLA for full approval for the cardiomyopathy associated with DMD."

13.     Defendants' fraudulent misconduct caused Plaintiffs and other Class members to purchase Capricor securities at artificially inflated prices. Investors first learned part of the truth on June 20, 2025, when *Stat News*[1] reported that Vinay Prasad, the director of the FDA's Center for Biologics Evaluation and Research ("CBER"), had canceled the previously scheduled advisory committee meeting for Capricor's BLA, emphasizing that he was "skeptical of the treatment" and that a meeting "would no longer be necessary" to assess the BLA.

14.     On this news, the price of Capricor's common stock declined from $11.94 per share on June 18, 2025 to $8.26 per share on June 20, 2025, or 30.8% in a single trading day, before dropping even further to $7.68 per share on June 23, 2025, representing a nearly 36% decline in value in two trading days.

15.     Notwithstanding, Defendants continued to mislead investors about regulatory communications and Capricor's BLA claiming, for example, "[o]ur continued dialogue with the FDA remains on track with no evidence of any delays"

[1] https://www.statnews.com/2025/06/20/fda-ouster-top-gene-therapy-official-nicole-verdun-placed-on-leave-after-review-committee-canceled/

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and professing that, "[t]o date, all regulatory milestones have proceeded as expected, including a successful pre-license inspection and a mid-cycle review with no major issues."

16.    These statements continued to conceal that the FDA had actually told Capricor that Phase III data would be needed to support a BLA for CAP-1002 (which if heeded would mean a substantial delay) and downplayed the significance of the manufacturing deficiencies identified during the agency's mandatory pre-licensing inspection of the San Diego facility which were documented for Capricor in a Form 483 received on May 30, 2025.

17.    Then, on July 11, 2025, Capricor issued a press release announcing it received a Complete Response Letter ("CRL") from the FDA denying the BLA seeking full approval of CAP-1002 for the proposed indication of DMD-associated cardiomyopathy, based only on existing cardiac data from the Phase II trial and OLE study compared to natural history data, because the BLA did not provide substantial evidence of effectiveness as required by statute, necessitating additional clinical data, and because of unresolved CMC deficiencies.

18.    On this news, the price of Capricor common stock declined from $11.40 per share on July 10, 2025, to $7.64 per share on July 11, 2025, representing a 33% decline in value in a single trading day.

19.    Plaintiffs seek to recover the significant losses suffered and damages caused by Defendants' fraudulent misconduct.

## II.    JURISDICTION AND VENUE

20.    Plaintiffs bring this action on behalf of themselves and other similarly situated investors to recover losses sustained in connection with Defendants' fraud alleged herein.

21.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.    Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant Capricor is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

24.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    THE PARTIES

25.    Plaintiff Maximilian Laserer purchased Capricor common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff Laserer's previously filed certification evidencing his transaction(s) in Capricor is hereby incorporated by reference herein. *See* ECF No. 6-3.

26.    Plaintiff Moussa Yeroushalmi purchased Capricor common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff Yeroushalmi's certification filed herewith, evidencing his transaction(s) in Capricor, is hereby incorporated by reference herein.

27.    Capricor Therapeutics, Inc. is a Delaware corporation with its principal executive offices located at 10865 Road to the Cure, Suite 150, San Diego, CA 92121. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "CAPR."

28.    Defendant Linda Marbán ("Marbán"), a co-founder of Capricor, has been with the Company since 2005, serving as the Company's CEO since 2010, and as a member of the Board of Directors since November 2013. As CEO, Ms. Marbán had ultimate authority and oversight over Capricor's business. Moreover, Ms. Marbán had access to the data Capricor submitted to the FDA in support of marketing approval of CAP-1002 for the proposed indication as well as the FDA's communications with Capricor regarding the BLA submitted.

29.    Ms. Marbán also spoke to Capricor investors in earnings calls about the Company's operations and through Capricor press releases, including about the CAP-1002 BLA, discussions with the FDA, and the San Diego facility where CAP-1002 was manufactured.

30.    In addition to her position at Capricor, Ms. Marbán has been in the biotechnology field for over two decades, previously acting as Vice President of Business Development and Vice President of Operations at Excigen, Inc. – a gene therapy biotechnology company – where she was responsible for operations and business development, as well as scientific management of Excigen, Inc.

31.    Defendant Marbán is sometimes referred to herein as the "Individual Defendant." Capricor together with the Individual Defendant is referred to herein as the "Defendants."

32.    The Individual Defendant, because of her position with the Company, possessed the power and authority to control the contents of Capricor's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual

Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of her position and access to material non-public information available to her, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendant.

33.     Capricor is liable for the acts of the Individual Defendant, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

34.     The scienter of the Individual Defendant, and other employees and agents of the Company are similarly imputed to Capricor under *respondeat superior* and agency principles.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Capricor and Its Lead Cell Therapy Candidate

35.     Capricor describes itself as a clinical-stage biotechnology company dedicated to the development and advancement of transformative cell and exosome-based therapeutics to redefine the treatment landscape for rare diseases.

36.     Since its founding in 2005, Capricor has primarily focused on the development and commercialization of its lead product candidate, CAP-1002 (later referred to as Deramiocel), a biologic comprised of allogeneic cardiosphere-derived cells (CDCs), isolated from donated healthy human heart cells, for the treatment of Duchenne muscular dystrophy (DMD) and other related indications.

37.     DMD is a rare form of the genetic disorder caused by the absence of functional dystrophin, a key structural protein in muscle cells, resulting in progressive muscle degeneration, affecting the skeletal, respiratory, and cardiac muscles, and premature death. Over time, deterioration of cardiac muscles leads to cardiomyopathy and heart failure, the leading cause of death for those with DMD.

38.     At all relevant times, the Company reported that DMD affects roughly 1 in 3,600 male infants worldwide and estimated that approximately 15,000 boys and young men are living with the disease in the United States, with an approximate 200,000 impacted worldwide. There is no cure for DMD, and treatment options remain limited. Further, the annual cost of care for patients with DMD is very high and increases with disease progression.

39.     According to Capricor, CDCs act by secreting extracellular vesicles known as exosomes, which target macrophages and alter their expression profile to adopt a healing, rather than a pro-inflammatory phenotype. Capricor asserts that CAP-1002 is designed to slow disease progression in DMD through the immunomodulatory, anti-inflammatory, and anti-fibrotic actions of encompassed CDCs, mediated by secreted exosomes laden with bioactive cargo.

40.     In April 2015, the FDA granted Orphan Drug Designation to CAP-1002 for the treatment of DMD. Orphan Drug Designation is granted by the FDA's Office of Orphan Drug Products to drugs intended to treat a rare disease or condition affecting fewer than 200,000 people in the United States or a disease or condition that affects more than 200,000 people in the United States and for which there is no reasonable expectation that the cost of developing and making available in the United States a drug for this type of disease or condition will be recovered from sales in the United States for that drug. This designation confers special incentives to the drug developer or sponsor, including tax credits for clinical

development costs and prescription drug user fee waivers, and may allow for a seven-year period of market exclusivity in the United States upon FDA approval.

41.     Likewise, in July 2017, the FDA granted Rare Pediatric Disease Designation to CAP-1002 for the treatment of DMD. The FDA defines a "rare pediatric disease" as a serious or life-threatening disease in which the serious or life-threatening manifestations primarily affect individuals aged from birth to 18 years and that affects fewer than 200,000 individuals in the United States, or a disease or condition that affects more than 200,000 people in the United States and for which there is no reasonable expectation that the cost of developing and making available in the United States a drug for this type of disease or condition will be recovered from sales in the United States for that drug.

42.     Under the FDA's Rare Pediatric Disease Priority Review Voucher program, upon the agency's approval of a qualifying New Drug Application ("NDA") or BLA for the treatment of a rare pediatric disease, the sponsor of such application would be eligible for a voucher that can be used to obtain Priority Review (defined below) for a subsequent NDA or BLA for a related indication.

**B.     United States Regulatory Background**

43.     As acknowledged by the Company, the research, development, testing, manufacture, quality control, approval, labeling, packaging, storage, recordkeeping, serialization and tracking, promotion, advertising, distribution and marketing, post-approval monitoring and reporting, and export and import, among other things, of its product candidates (like CAP-1002) are extensively regulated by governmental authorities in the United States and other countries.

44.     In the United States, the FDA regulates drugs and biologics under the Federal Food, Drug, and Cosmetic Act (the "FD&C Act"), and its implementing regulations, pursuant to which no pharmaceutical product, including biologics like

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CAP-1002, may be commercially marketed to the public, and, in turn, generate revenue from sales, without prior approval from the FDA.

45.     To obtain FDA marketing approval, a sponsor takes responsibility for compliance with product and establishment standards and must submit a qualifying NDA (for small-molecule chemically synthesized drugs) or BLA (for large-molecule biologics derived from living sources). 21 C.F.R. § 601.2.

46.     A properly submitted NDA or BLA provides the FDA with all pertinent information about the pharmaceutical candidate, including data and statistical analyses sufficient to determine whether: (1) the product candidate is safe and provides the benefits it purports to; (2) the benefits of the product candidate outweigh its risks; (3) the product candidate's proposed labeling is appropriate and specifically identifies what the label should contain; and (4) the methods used in manufacturing the product and the controls used to maintain the product's quality are adequate to preserve its identity, strength, quality, and purity. Each section must meet the required standards for an NDA or BLA to be approved.

47.     The efficacy and safety data necessary to support an NDA or BLA are generated in two distinct stages: pre-clinical and clinical testing. The pre-clinical development stage generally involves laboratory evaluations of the product's chemistry, formulation, and stability, as well as non-human studies to evaluate pharmacological activity and toxicity in animals, which are designed to support subsequent clinical testing.

48.     The clinical stage of development involves administering the product candidate to the target patient population under the supervision of qualified investigators. Pharmaceutical developers or sponsors typically subject a new product candidate to a series of three sequential phases of clinical trials designed to accumulate the data necessary to submit a successful NDA or BLA. *See* 21 C.F.R. § 312.21.

49.     Phase I clinical trials are the initial introduction of an investigational new product to a small pool of human subjects, generally 20 to 80 participants. 21 C.F.R. § 312.21(a). Phase I clinical trials typically focus on discovering the product's safety profile, including the determination of its metabolism and pharmacologic actions in humans and the side effects associated with increasing doses. During Phase I, sufficient information about the product's pharmacokinetics and pharmacological effects should be obtained to permit the design of well-controlled, scientifically valid, Phase II studies.

50.     Once the safety profile is established and the dosage selected, the product candidate typically progresses to Phase II testing. Phase II clinical trials usually involve larger patient populations than Phase I trials (usually involving no more than several hundred subjects) and are used to evaluate or conduct exploratory analysis of the product's effectiveness for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the investigational new product. 21 C.F.R. § 312.21(b). Phase II clinical trials are typically well-controlled, closely monitored, and designed to provide sufficient evidence of preliminary efficacy for specific indications to warrant further investigation.

51.     A Phase I/II clinical trial is a combined study that integrates elements of both Phase I and Phase II trials. The aim is to expedite the development of new treatments by gathering information on both safety and efficacy simultaneously, rather than conducting these phases separately. As such, in addition to determining the safety, side effects, and optimal dosage of a new treatment, a Phase I/II trial also assesses the treatment's efficacy (*i.e.*, the extent to which the disease responds to the investigational drug product).

52.     Finally, if the investigational product has demonstrated sufficiently promising efficacy in a Phase II trial, sponsors move forward with confirmatory

Phase III trials. Phase III clinical trials are intended to gather additional information on the product's effectiveness and safety needed to evaluate the overall benefit-risk relationship and to provide an adequate basis for marketing approval for widespread public use. 21 C.F.R. § 312.21(c). Phase III studies usually include a substantially larger patient population than Phase II trials (*e.g.*, from several hundred to several thousand subjects) and typically involve double-blind comparisons with placebo.

53.    In addition to substantial clinical data, to obtain marketing approval, a sponsor must prove that it meets all CMC requirements. Specifically, 21 C.F.R. § 601.2(d) provides that BLA approvals require "a determination that the establishment(s) and the product meet applicable requirements to ensure the continued safety, purity, and potency of such products. Applicable requirements for the maintenance of establishments for the manufacture of a product subject to this section shall include but not be limited to the good manufacturing practice requirements." *Id.*

54.    Accordingly, the CMC section of the application must show, *inter alia*, that the product's manufacturing process and the facilities in which it will be manufactured meet cGMP standards, that the manufactured product is pure and consistent, that all important manufacturing data is properly recorded, analyzed, and logged, and that manufacturing personnel are properly qualified and overseen.

55.    Critical elements of CMC look at: (1) how and where the product candidate is made; (2) how raw materials are tested and monitored; (3) what control procedures are in place to assure product consistency and quality; (4) whether quality attributes are adequately identified and characterized for the product; (5)

whether test methods to use product quality are appropriate; and (6) how long the product maintains its quality after production.[2]

56.    CMC requirements exist to assure that any pharmaceutical sold to the public will have quality attributes similar to those of the product that was demonstrated to be safe and effective in a clinical setting; to assure that the quality of the product meets appropriate standards and is consistent; and to assure that the product is the same as that described on the label.

57.    In short, CMC requirements maintain the connection in quality between the product used in clinical testing and the product to be marketed to consumers. A manufacturing process under control will exhibit consistent product quality, with minimal or no variability between batches.

### C.    Evidentiary Criteria for Demonstrating Efficacy

58.    Under the Public Health Services Act ("PHS") a biological product such as CAP-1002 cannot be licensed by the FDA unless the company sponsor demonstrates that it is "safe, pure, and potent." 42 U.S.C. § 262(a)(2)(C)(i)(I).

59.    The FDA's implementing regulations interpret the term "potency" to include "effectiveness." *See* 21 C.F.R. § 600.3(s). Accordingly, the agency has "generally considered substantial evidence of effectiveness to be necessary to support licensure of a biological product under Section 351 of the PHS Act."[3]

60.    Under 21 U.S.C. § 355(d), "substantial evidence" is defined as:
[E]vidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be

---

[2] *See* Elizabeth Pollina Cormier, Ph.D., Review Chemist Division of Manufacturing Technologies, *Chemistry, Manufacturing and Controls (CMC) and Good Manufacturing Practices (GMPs): The Big Picture of a Long-term Commitment*, available at: www.accessdata.fda.gov>static>cvm>cormier>CMCsandCGMPS.

[3] FDA, *Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products*, Guidance for Industry [Draft], December 2019, at pp. 3-4.

concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

61. "Reports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs[,]" including biologic products. 21 C.F.R. § 314.126(a). Pursuant to 21 C.F.R. § 314.126(b), the FDA considers the following characteristics in determining whether an investigation is adequate and well-controlled for purposes of Section 505 of the FD&C Act:

(1) There is a clear statement of the objectives of the investigation and a summary of the proposed or actual methods of analysis in the protocol for the study and in the report of its results. In addition, the protocol should contain a description of the proposed methods of analysis, and the study report should contain a description of the methods of analysis ultimately used. If the protocol does not contain a description of the proposed methods of analysis, the study report should describe how the methods used were selected.

(2) The study uses a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect. The protocol for the study and report of results should describe the study design precisely; for example, duration of treatment periods, whether treatments are parallel, sequential, or crossover, and whether the sample size is predetermined or based upon some interim analysis.

(3) The method of selection of subjects provides adequate assurance that they have the disease or condition being studied, or evidence of susceptibility and exposure to the condition against which prophylaxis is directed.

(4) The method of assigning patients to treatment and control groups minimizes bias and is intended to assure comparability of the groups with respect to pertinent variables such as age, sex, severity of disease, duration of disease, and use of drugs or therapy other than the test drug. The protocol for the study and the report of its results should describe how subjects were

16

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

assigned to groups. Ordinarily, in a concurrently controlled study, assignment is by randomization, with or without stratification.

(5)    Adequate measures are taken to minimize bias on the part of the subjects, observers, and analysts of the data. The protocol and report of the study should describe the procedures used to accomplish this, such as blinding.

(6)    The methods of assessment of subjects' response are well-defined and reliable. The protocol for the study and the report of results should explain the variables measured, the methods of observation, and criteria used to assess response.

(7)    There is an analysis of the results of the study adequate to assess the effects of the drug. The report of the study should describe the results and the analytic methods used to evaluate them, including any appropriate statistical methods. The analysis should assess, among other things, the comparability of test and control groups with respect to pertinent variables, and the effects of any interim data analyses performed.

62.    The FDA has interpreted the statutory standard of substantial evidence of effectiveness as generally requiring data from two adequate and well-controlled clinical investigations, each convincing on its own, to establish necessary product effectiveness for marketing approval in the United States.[4]

63.    The FDA has acknowledged some regulatory flexibility in applying such statutory standards to treatments for serious diseases with unmet needs, qualified by preserving requirements for appropriate assurance of safety and effectiveness. *See id.* Specifically, the agency has interpreted its statutory requirements under these circumstances such that it may consider data from one adequate and well-controlled clinical investigation accompanied by qualifying confirmatory evidence used to substantiate an adequate and well-controlled clinical

---

[4] FDA, *Demonstrating Substantial Evidence of Effectiveness With One Adequate and Well-Controlled Clinical Investigation and Confirmatory Evidence*, Guidance for Industry [Draft], September 2023, at p. 2.

investigation, but only if the FDA determines that such data are sufficient to establish effectiveness. *Id.*

64.    Further, the quality and quantity (*e.g.*, number of distinct sources) of confirmatory evidence needed in a development program will be impacted by the features of, and results from, the qualifying adequate and well-controlled clinical investigation that the confirmatory evidence is intended to substantiate. *Id.* at 4.

65.    FDA guidance provides various examples of data sources that may, in appropriate circumstances, qualify as confirmatory evidence to substantiate one adequate and well-controlled clinical investigation to demonstrate substantial evidence of effectiveness. *See id.* at 5-13. Such examples include: (1) clinical evidence of effectiveness that formed the basis of the previous approval for a different but closely related indication; (2) mechanistic or pharmacodynamic evidence; (3) evidence from a relevant animal model; (4) evidence of effectiveness from other adequate and well-controlled trials of other drugs in the same pharmacological class approved from the same indication; (5) natural history evidence; (6) real-world data and/or real-world evidence; and (7) evidence from expanded access use of an investigational drug. *Id.*

66.    In pertinent part, natural history evidence can be useful when there is uncertainty about whether the outcomes observed in the control group accurately reflect those that would have been expected in the absence of the intervention. Such data being used as confirmatory evidence, however, ***must be distinct from any data used as a control for any adequate and well-controlled clinical investigation***.[5] *See id.* at 10.

67.    Pursuant to Section 3022 of the 21st Century Cures Act, the FDA developed a program to evaluate the potential use of real-world evidence to help support the approval of a new indication for a drug ***already approved*** under Section

---

[5] Unless otherwise noted, all emphasis is added.

505(c) of the FD&C Act or to help support **or satisfy post-approval study requirements**. The FDA defines real world data ("RWD") and real-world evidence ("RWE") as follows:

- RWD are data relating to patient health status or the delivery of health care routinely collected from a variety of sources (*e.g.,* electronic health records, medical claims data, registries).

- RWE is the clinical evidence about the usage and potential benefits or risks of a drug derived from analysis of real-world data.[6]

68.    Whether an RWD source may be appropriate to develop RWE that serves as confirmatory evidence depends on several factors, including but not limited to the reliability and relevance of the RWD source and, when relevant (*e.g.,* for open-label extension studies), the quality of the study design and the use of appropriate prespecified statistical methods and analyses. *Id.*

69.    Sponsors who plan to establish substantial evidence of effectiveness with a single adequate and well-controlled clinical investigation bolstered by sufficient confirmatory evidence are advised to discuss their proposed approach with the FDA early in development, such as at a pre-IND meeting and no later than when the sponsor is seeking feedback regarding the clinical investigation (*e.g.*, at the End-of-Phase II meeting). *See id.* at 12. When meeting with FDA, sponsors should be prepared to provide a rationale for their chosen approach to development, along with descriptions of the planned single adequate and well-controlled clinical investigation and planned confirmatory evidence. *Id.* The goal of such engagement is to allow the sponsor and agency an opportunity to evaluate whether a development program consisting of a single adequate and well-controlled clinical

---

[6] FDA, *Demonstrating Substantial Evidence of Effectiveness With One Adequate and Well-Controlled Clinical Investigation and Confirmatory Evidence*, Guidance for Industry [Draft], September 2023, at p. 11.

investigation and confirmatory evidence could demonstrate substantial evidence of effectiveness. *Id*.

### D.    Relevant Principles of Clinical Trial Design and Analysis

70.    The purpose of conducting adequate and well-controlled clinical investigations of a drug is to "distinguish the effect of a drug from other influences, such as spontaneous change in the course of the disease, placebo effect, ***or biased observation***." 21 C.F.R. § 314.126(a). As such, the final determination of efficacy is typically made based on the pre-specified clinical endpoints as defined in the study protocol. Statistical tests are also predefined before the clinical trial begins.

71.    A clinical trial's "endpoints" are measurements of what happens to participants in the trial. When a trial is intended to evaluate the efficacy and safety of a new medical product or a new use of an approved product, its endpoints usually measure benefit. Investigators typically use either clinical or surrogate endpoints.

72.    Clinical outcomes are the most reliable clinical trial endpoints. They directly measure whether participants in a trial feel or function better or live longer. The benefit of a therapy, as measured by clinical outcomes (*e.g.,* improvement in symptoms), is assessed to determine whether it outweighs any adverse effects.

73.    Surrogate endpoints are used when the clinical outcomes might take a very long time to study, or in cases where conducting a clinical endpoint study would be unethical. According to Section 507(e)(9) of the FD&C Act, "[t]he term 'surrogate endpoint' means a marker, such as a laboratory measurement, radiographic image, physical sign, or other measure, that is not itself a direct measurement of clinical benefit, and … is known to predict clinical benefit … or [] is reasonably likely to predict clinical benefit.''

74.    The methodology for assessing, measuring and analyzing pre-specified endpoints is detailed in the trial's statistical analysis plan ("SAP").

National regulatory agencies around the world (including the FDA) require SAPs to be submitted when considering drugs, biologics, and devices for approval.

75.     While the trial protocol describes all primary and secondary endpoints and analyses, the SAP is meant to detail planned statistical analyses, so that they are not selected after the fact to provide a desired outcome. In addition, the SAP defines the population(s) and time point(s) used for each analysis.[7] It defines statistical methodology as well, including multiplicity control, sensitivity analyses, methods used to handle missing data, subset analyses prospectively identified, and the specific analyses performed on each subset of interest.

76.     The SAP must be completed before the study data is unblinded (in a blinded trial) or the statistical team has access to the accumulating data (in an unblinded trial). Unless impossible, the FDA guides sponsors to finalize the SAP *before* the first patient is enrolled.[8]

77.     There are significant benefits to completing the SAP while the study protocol is being developed. For example, the protocol clarity needed by the statistician for the SAP can act as a catalyst to unearth design flaws in a protocol that is still being developed. Otherwise, those flaws can live in the study design until found by the trial implementation team on site or during the data analysis phase. If uncovered during the data analysis phase, it may suddenly dawn on the statistical team that the research question cannot be answered with the trial that was implemented. An additional benefit of co-developing the study protocol and SAP is the resulting increase in the likelihood that the clinical trial will end informatively.

---

[7] *See* Gary Stevens, Shawn Dolley, Robin Mogg, Jason T. Connor, *A template for the authoring of statistical analysis plans*, Contemporary Clinical Trials Communications, 2023 Jun 9;34:101100.

[8] *See* FDA, *Guidance Document on Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics Guidance for Industry*, December 2018 at 14.

78.     While there may always be some *post hoc* or exploratory analysis after clinical data is collected, the SAP is supposed to identify all primary, secondary, and pre-specified exploratory analyses and the precise methods to be used for each before the data is unblinded. In doing so, the aim is to avoid the bias inherent where investigators or statisticians who have seen the data alter the statistical analysis.

79.     Similar issues may arise with subgroup analyses which refer to any evaluation of a treatment effect for a specific endpoint in subgroups of patients identified by baseline characteristics. Certain trial protocols specify a subgroup analysis to assess treatment effects for a specific patient characteristic. Pre-specifying subgroups before any data is known avoids data dredging, the "the inappropriate (sometimes deliberately so) use of data mining to uncover misleading relationships in data."[9]

80.     By contrast, a *post hoc* subgroup analysis where the hypothesis tested is not specified prior to examining the trial data carries a high risk of finding false positive results because, by definition, it has neither been proven by an investigation nor generated from a scientific basis.

81.     For example, in the "Texas Sharpshooter Fallacy," a gunman fires a rifle into a barn, paints a target around the bullet hole, and claims to have hit a bullseye. This fallacy is widely appreciated in the statistics of clinical trials, because the sharpshooter resembles a researcher trying to find statistically significant groups after an experiment is conducted. Data in clinical trials can be sliced in any number of ways, some of which are bound to display statistically significant differences by sheer chance. For example, patients with red hair might have statistically significantly better outcomes. This, of course, does not mean that having red hair makes a true difference in making the treatment work better.

---

[9] *See* http://en.wikipedia.org/wiki/Data_dredging.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

82.    By running multiple *post hoc* analyses, a researcher can all but guarantee a statistically significant result in at least one of them. Just as someone rolling a twenty-sided dice will eventually roll a 20, researchers who run different *post hoc* analyses on the population will eventually find one that shows the treatment "worked."  This problem is called "multiplicity" in statistics and results in inflated false positives.[10] For this reason, experts have noted that "*post hoc* observations should be treated with skepticism irrespective of their statistical significance."[11]

E.    **The FDA's Increased Involvement and Expedited Review for the Treatment of Rare Diseases or to Meet Unmet Medical Needs**

83.    The FDA recognizes that speeding the availability of pharmaceuticals that treat serious diseases is in everyone's interest, especially when the products are the first available treatment or have significant advantages over existing treatments.

84.    Accordingly, the FDA developed the following approaches to assist applicants in achieving market approval of such pharmaceuticals expeditiously: (1) Fast Track; (2) Breakthrough Therapy; (3) Priority Review; and (4) Accelerated Approval. As detailed below, each approach has unique assistive features designed to stack cohesively as the product candidate progresses through the various stages of development, application construction and submission, and review process.

85.    *First*, a Fast Track designation facilitates the development and expedited review of pharmaceuticals designed to treat serious conditions and fill an unmet medical need. Whether the product is designed to treat serious conditions

---

[10] Wang R. Statistics in Medicine - Reporting of Subgroup Analyses in Clinical Trials. NEJM 2007; 357; 21:2189-2194.

[11] Rothwell PM, *Treating Individuals 2 - Subgroup Analysis in Randomized Controlled Trials: Importance, Indications, and Interpretation*, Lancet 2005; 365:176-86.

1  is generally based on whether it will have an impact on such factors as survival,
2  day-to-day functioning, or the likelihood that the condition, if left untreated, will
3  progress from a less severe condition to a more serious one. Filling an unmet
4  medical need is defined as providing a therapy where none exists or providing a
5  therapy that may be potentially better than available therapy.

6      86.    Throughout the course of a product's development, the FDA typically
7  holds three types of formal meetings with the sponsor/applicant: Type A, Type B,
8  and Type C meetings. When necessary, the FDA holds Type A meetings to help
9  advance a stalled product development program, which typically take place within
10 30 days of the FDA receiving a request for such a meeting from the applicant. Type
11 B meetings typically take place within 60 days of a written meeting request and are
12 conducted at specific points in product development including, to obtain FDA-
13 input prior to submission of an investigational new drug application (pre-IND),
14 certain End-of-Phase I trial meetings, End-of-Phase II and pre-Phase III meetings,
15 and prior to submission of a BLA (*i.e.*, pre-BLA meetings). Type C meetings refer
16 to all other formal meetings regarding the development and review of an
17 investigational product and are typically held within 75 days of a written request.

18     87.    A drug that receives Fast Track designation is afforded the following:
19     • More frequent meetings with the FDA to discuss the product's
20        development plan and ensure collection of appropriate data needed to
21        support marketing approval;
22     • More frequent written communication from the FDA about such
23        things as the design of the proposed clinical trials and use of
24        biomarkers;
25     • Eligibility for Accelerated Approval and Priority Review, if relevant
26        criteria are met; and

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Rolling Review which allows the sponsor to submit completed sections for review by the FDA, rather than waiting until every section is completed before the entire application can be reviewed.

88.    *Second*, a Breakthrough Therapy designation expedites the development and review of drugs that are intended to treat a serious condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s), which generally refers to an endpoint that measures an effect on irreversible morbidity or mortality or on symptoms that represent serious consequences of the disease.

89.    A Breakthrough Therapy designation affords all the Fast Track designation features, as well as intensive guidance on an efficient product development program (*i.e.* clinical testing), beginning as early as Phase I, and the FDA's commitment to the program involving senior managers. The primary intent of this designation is to develop evidence needed to support approval as efficiently as possible. As such, the FDA encourages sponsors to submit their request for such no later than the end of Phase II meeting.

90.    *Next*, a Priority Review designation directs the FDA's overall attention and resources to the evaluation of applications for product candidates that, if approved, would be significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications. A significant improvement may be demonstrated by, *inter alia*, evidence of increased effectiveness in treatment, prevention, or diagnosis of condition; elimination or substantial reduction of a treatment-limiting drug reaction; documented enhancement of patient compliance that is expected to lead to an improvement in serious outcomes; or evidence of safety and effectiveness in a new subpopulation.

91.     This designation shortens the overall review time, with the FDA agreeing to take action on a completed application within 6 months (as compared to 10 months under standard review). An applicant may expressly request Priority Review; however, the agency will assess review designation for every application received. The FDA informs the applicant of a Priority Review designation within 60 days of receiving the application. Notably, a "Priority" designation ***does not*** alter the scientific or medical standard for approval or the quality of evidence necessary.

92.     *Lastly*, Accelerated Approval is used to facilitate and expedite the development and review of new drugs, including biologics, to address an unmet medical need in the treatment of a serious or life-threatening condition, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments.[12] This approach often allows sponsors to obtain marketing approval sooner than would be possible under Full (or Traditional) Approval, where substantial evidence of effectiveness is provided by trials that directly measure an effect on the clinical outcome of interest, or on validated endpoints that have been extensively studied, and commonly require more time to complete. Comparatively, Accelerated Approval allows consideration of data that demonstrates efficacy based on surrogate or intermediate clinical endpoints that are reasonably likely to predict clinical benefit for the condition.

93.     Accelerated Approval has been used in settings in which the disease course is long or the clinical outcome events intended to be reduced by the drug are infrequent. For example, Accelerated Approval has been used extensively in the approval of drugs to treat a variety of cancers where an effect on tumor growth can be assessed rapidly, but demonstrating an effect on survival or other endpoint

---

[12] *See* FDA, *Expedited Program for Serious Conditions – Accelerated Approval of Drugs and Biologics*, Guidance for Industry, December 2024, at p. 2.

relevant to show clinical benefit for a particular cancer would need longer and sometimes larger trials because of the duration of the typical disease course.

94.    The risks of this approach, however, include that patients may be exposed to adverse effects of a drug that ultimately does not demonstrate clinical benefit. In addition, because clinical trials may be smaller or shorter than typical for a drug pursuing or receiving Traditional Approval, there may be less information available about the occurrence of rare or delayed adverse events. These risks inform the FDA's decision-making regarding use of Accelerated Approval.

95.    Accordingly, the FDA may consider applications under Accelerated Approval for conditions where an effect on a surrogate endpoint could be shown in a smaller number of patients, but a much larger study is needed to show the effect on a clinical outcome, such as survival. As such, a prerequisite to Accelerated Approval is the commitment to complete post-approval confirmatory studies to verify and describe the anticipated effect on irreversible morbidity, mortality or other clinical benefits. If it is clear during development that a product is intended to be approved under Accelerated Approval on the basis of a surrogate endpoint or an intermediate clinical endpoint, the FDA generally requires that the confirmatory trial(s) be underway at the time the marketing application is submitted.

96.    Notably, drugs granted Accelerated Approval must still meet the same statutory standards for safety and effectiveness as those granted Traditional Approval.[13] As described in detail above, for effectiveness, the standard is substantial evidence based on adequate and well-controlled clinical investigations. For safety, the standard is sufficient information to determine that the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling. An application for Accelerated Approval should also include

---

[13] FDA, Guidance for Industry, *Expedited Programs for Serious Conditions – Drugs and Biologics*, May 2014, at p. 19.

adequate evidence that a proposed surrogate endpoint or an intermediate clinical endpoint is reasonably likely to predict the intended clinical benefit of the drug.

97.    Determining whether a proposed surrogate endpoint or an intermediate clinical endpoint is reasonably likely to predict clinical benefit will depend on the biological plausibility of the relationship between the disease, the endpoint, and the desired effect and the empirical evidence to support that relationship. Such empirical evidence may include "epidemiological, pathophysiological, therapeutic, pharmacologic, or other evidence developed using biomarkers, for example, or other scientific methods or tools." Section 506(c)(1)(B) of the FD&C Act. Evidence of pharmacologic activity alone is not sufficient, however. Clinical data should be provided to support a conclusion that a relationship of an effect on the endpoint to an effect on the clinical outcome is reasonably likely.

### F.    The BLA Submission, Filing, and Review Process

98.    FDA procedures make "submission" and "filing" distinct events. Specifically, a pharmaceutical company "submits" an NDA or BLA to the FDA.

99.    When an applicant "submits" a BLA to the FDA, the agency expects the application to be sufficiently complete to permit a meaningful review by agency staff. Once the application is fully submitted, the agency conducts a preliminary review for facial sufficiency, *i.e.*, assessing that each section of Form 356h has been included, at which point it either accepts or rejects the application for review.

100.    The acceptance of a BLA for filing is not a determination of the substantive merits of the BLA, but rather a threshold determination of whether there is enough data to conduct a substantive examination. If the FDA determines there is a facial problem preventing a meaningful substantive examination – for example, if the BLA is missing paperwork, fails to include data in the proper format, or suffers from other facial errors that make review impossible – the FDA

may refuse to file the BLA. Otherwise, substantive determinations are reserved for the full application review.

101. If accepted for filing, the FDA "files" the application into a dossier and determines the application's review designation (*e.g.*, priority or standard) and assigns a "goal date" by which it will make a decision to approve or reject the BLA, in accordance with the Prescription Drug User Fee Act of 1992 ("PDUFA") (*i.e.*, the PDUFA date).

102. Once the application is successfully submitted and filed, agency staff will conduct a complete substantive review. This process includes the following:

- Each member of the review team conducts a full review of his or her section of the application. For example, the medical officer and the statistician review clinical data, while a pharmacologist reviews the data from animal studies. Within each technical discipline represented on the team, there is also a supervisory review.

- FDA inspectors travel to manufacturing facilities named in the application to conduct mandatory pre-approval inspection ("PAI") or pre-license inspection ("PLI") to evaluate the facility's compliance with cGMP regulations. During the inspection, the FDA inspectors look for, *inter alia*, evidence that the establishment is capable of manufacturing the product as described in the application, that submitted data is accurate and complete, and assurances of data integrity, including appropriate controls and other written procedures.

- The FDA holds a mid-cycle and late-cycle meetings with the sponsor during which agency staff discuss concerns that have emerged during its review of the BLA. The timing of these meetings depends on the assigned review designation. For a standard review, the FDA holds a

29

mid-cycle meeting approximately five months after the BLA was filed, and a late-cycle meeting approximately four months later.

- If questions arise regarding the sufficiency of data to determine the safety and effectiveness of the product candidate, requiring additional consideration beyond the application, the FDA may organize a meeting of one of its Advisory Committees to get independent, expert advice and to permit the public to make comments.

- The project manager assembles all individual reviews and other documents, such as the inspection report, into an "action package." This document becomes the record for FDA-review. The review team issues a recommendation, and a senior FDA official makes a decision.

103. Upon the completion of its substantive review, the FDA may decide to approve the product for marketing or issue a Complete Response Letter ("CRL") rejecting the application and citing deficiencies identified during the substantive review process.

104. A CRL is considered a formal regulatory action identifying material problems with the application submitted, such as insufficient clinical data to support the safety or effectiveness of the product and/or concerns about CMC compliance. A sponsor that disagrees with the findings of a CRL may request a hearing before the FDA to challenge the decision. 21 C.F.R. §§601.4 and 601.7.

105. A sponsor who receives a CRL from the FDA can resubmit the application, addressing each of the deficiencies identified in the CRL. The regulatory review process, however, will not begin anew until a resubmission is deemed complete.

106.    The FDA classifies resubmissions of an original BLA or NDA, received in response to a CRL, as "Class 1" or "Class 2" resubmissions.[14] A Class 1 response typically denotes minor amendments, such as labeling, assay validation data or minor re-analysis of the data previously submitted to the application, or discussions of post-marketing requirements/commitments. A Class 2 response typically denotes more severe amendments needed, including any item requiring a presentation to an advisory committee, a resubmission requiring a reinspection, or a resubmission including a Risk Evaluation and Mitigation Strategy ("REMS") with Elements to Assure Safe Use ("ETASU") not included in the original application, or significant amendment to a previously submitted REMS with ETASU.

107.    The agency's review team typically completes its review and acts on a Class 1 resubmission within 2 months of its receipt date, while a Class 2 resubmission is typically handled within 6 months of its receipt date.

G.    **Capricor's Clinical Development of CAP-1002**

1.    *HOPE 1 – Completed Enrollment and Topline Analysis in 2017*

108.    CAP-1002 was first identified in the lab of Capricor's scientific founder Eduardo Marbán, MD, PhD, while he was Chief of Cardiology, Physiology and Biomedical Engineering at The Johns Hopkins University.

109.    At all relevant times, Dr. Eduardo Marbán, former husband of Defendant Marbán, served as Executive Director of the Smidt Heart Institute at Cedars-Sinai Medical Center in Los Angeles, California.

110.    Capricor's clinical development of CAP-1002 has primarily been focused on generating evidence of effectiveness and safety data to support a BLA for CAP-1102 as a treatment of DMD.

---

[14] FDA, Office of New Drugs, *Classifying Resubmissions of Original NDAs, BLAs and Efficacy Supplements in Response to Complete Response Letters*, Effective October 21, 2024, MAPP 6020.4 Rev. 3, at pp. 3-5.

111.    Capricor reasoned that the clinical development of CAP-1002 for the treatment of DMD based on preclinical models demonstrating the cell therapy's mechanism of action, which showed potential to decrease inflammation and slow muscle degeneration while exerting positive effects on muscle regeneration.

112.    The Company's DMD clinical program began with the Phase I/II HOPE-Duchenne trial ("HOPE-1"), commenced in February 2016. HOPE-1 was a randomized, controlled, open-label, multi-center clinical trial, designed to evaluate the safety and exploratory efficacy of CAP-1002 in patients with DMD. Twenty-five patients with DMD over 12 years old, with substantial myocardial fibrosis, were randomized (1:1) to receive either CAP-1002 on top of usual care (active treatment arm) (n=13) or usual care only (control) (n=12). All participants assigned to the active treatment arm were to receive an intended total dose of 75 million CDCs via intracoronary infusion of 25 million CDCs into each of the three left ventricle cardiac territories (anterior, lateral, inferior/posterior). HOPE 1 was designed with a one-time dosing schedule. The last participating patient received global intracoronary infusion in September 2016. Patients were observed over the course of 12 months. Efficacy was evaluated according to several exploratory outcome measures relating to skeletal and cardiac function.

113.    In June 2017, Capricor met with the FDA to discuss potential clinical endpoints for its regulatory strategy for CAP-1002 in the DMD indication. According to the Company, the minutes of the meeting indicated the FDA's willingness to accept Capricor's proposal to use the Performance of the Upper Limb, or PUL, test as the basis for the primary efficacy endpoint for the clinical study of CAP-1002 in support of a BLA for marketing approval.

114.    The PUL test is an outcome metric that was specifically designed to assess upper limb function in ambulant and non-ambulant patients with DMD. The spectrum of DMD severity ranges from weak ambulant male children to non-

ambulant patients with limited residual finger movements. The PUL scale tests the proximal to distal progression of muscle weakness in DMD through three levels: high (shoulder domain), mid (elbow domain), and distal (wrist and finger domain).

115.   The PUL score (version 1.2) was devised to assess motor performance in the upper limb and includes 22 items related to functional tasks that patients and clinicians identified as relevant. Five items are dedicated to the high level, which comprise of entry item, shoulder abduction to shoulder height, shoulder abduction above shoulder height, shoulder flexion to shoulder height, and shoulder flexion above shoulder height. Nine items are dedicated to the proximal level, which comprise bringing hand(s) to mouth and to table from lap, moving weight on table, lifting light and heavy cans, stacking light and heavy cans, removing lid from container and tearing paper. Eight items are dedicated to distal level, which comprise of tracing a path, push on the light, turning light, picking up coins, placing fingers on number diagram, lifting with finger pinch grip, lifting with 3-point grip and lifting with thumb (key) grip.

116.   In November 2017, Capricor reported positive 12-month data from the HOPE-1 trial. As shoulder function had already been lost in most of the HOPE-1 participants, Capricor used the combined mid-distal PUL subscales to assess changes in skeletal function and reported finding significant improvement in those treated with CAP-1002 in the defined *post hoc* analysis and reported achieving statistical significance in several exploratory measures designed to assess cardiac structure and function. Capricor also reported that CAP-1002 was generally safe and well-tolerated in the HOPE-1 trial.

117.   In February 2018, the FDA granted Regenerative Medicine Advanced Therapy ("RMAT") designation to CAP-1002 for the treatment of DMD. The FDA grants the RMAT designation to regenerative medicine therapies intended to treat, modify, reverse, or cure a serious or life-threatening disease or condition and for

which preliminary clinical evidence indicates a potential to address unmet medical needs for that condition. Capricor submitted its request for RMAT designation based on the results of its Phase I HOPE-1 clinical trial.

118.   The RMAT designation made CAP-1002 eligible for the same actions to expedite the development and review of a marketing application available under Fast Track or Breakthrough Therapy Designation – including increased meeting opportunities with the FDA and early interactions to discuss any potential surrogate or intermediate endpoints and the potential to support Accelerated Approval.

2.    *HOPE-2 – Completed Enrollment and Interim Analysis in 2H 2019; Topline Analysis in 2H 2020, Re-Analyzed in 2H 2021*

119.   Capricor subsequently initiated a Phase II clinical trial evaluating the safety and efficacy of CAP-1002 in study participants with DMD ("HOPE-2"). HOPE-2 was a randomized, double-blind, placebo-controlled clinical trial designed to evaluate the safety and efficacy of repeat, intravenous (or IV) infusions of CAP-1002, in boys and young men with DMD, at least 10 years of age at time of consent, with evidence of skeletal muscle impairment regardless of ambulatory status and who were on a stable regimen of systemic glucocorticoids. Participants were to receive four doses of CAP-1002 (a total of 150 million CDCs) or placebo – once every three months – over a one-year period for a total of four doses.

120.   Originally, HOPE-2 was designed as an 84-patient clinical trial to be conducted at approximately 10 to 15 sites located in the United States. Enrollment commenced in April 2018, and by the year end, Capricor had enrolled 17 patients across 9 testing sites. However, after a patient enrolled in HOPE-2 had a serious adverse event in the form of anaphylaxis, in December 2018, enrollment ceased and dosing of already enrolled patients was put on hold as Capricor developed a plan to manage potential allergic reactions.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

121.    According to Capricor, an investigation of the incident suggested that the patient may have been allergic to something contained in the investigational CAP-1002 product, including an excipient, or inactive ingredient, in the formulation. To reduce the risk of future events, Capricor initiated a pre-medication strategy commonly used by physicians to prevent and treat allergic reactions.

122.    After an approximate one-month period for review of the Company's pre-medication strategy, the FDA and the HOPE-2 trial's Data and Safety Monitoring Board ("DSMB") granted Capricor permission to resume enrollment. By March 2019, Capricor had enrolled an additional 3 patients in HOPE-2, bringing the total to 20 trial participants.

123.    However, following the recorded severe adverse event and resulting delay in enrollment/dosing and added costs associated with its mitigation plan to prevent future adverse events, rather than continuing towards the 84 patients originally specified in the protocol for this Phase II trial, Capricor decided to cease further enrollment of patients, proceed with only the 20 patients then enrolled, changed the interim data analysis point to 6 months as opposed to the originally-specified 12 months for certain subjects, and terminated several pre-designated testing sites to shrink the trial and conserve resources.

124.    The primary efficacy endpoint of HOPE-2 was the relative change in DMD patients' abilities to perform manual tasks that relate to activities of daily living and are important to their quality of life. These abilities were measured through the trial's assessment of mid-level PUL 1.2 which, as described above, assesses the ability to use the muscles from elbow to hand, essential for operating wheelchairs and performing other daily functions. Approximately 80% of the patients enrolled in HOPE-2 were non-ambulant, meaning they were unable to walk or move about independently, relying on wheelchairs, walkers, or other aids.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

125.   According to Capricor, although the mid-level PUL 1.2 was the pre-specified test for the primary endpoint established for HOPE-2, it also conducted an analysis using the Full PUL version 2.0, purportedly because during a formal meeting with the FDA in December 2018, the agency suggested the use of the updated PUL 2.0 as the primary efficacy endpoint to support a BLA.

126.   PUL 2.0 revised PUL 1.2 to improve its clarity and psychometric properties and was seen as a better measure of motor performance. In addition, PUL 2.0 was better able to detect change at 12 months in all levels of ability than PUL 1.2. PUL 2.0 also had simpler scoring, removing double-counting and simplifying item hierarchy, making it easier to interpret.

127.   HOPE-2 also included several additional secondary and exploratory endpoints such as cardiac function, pulmonary function, and quality of life including, *inter alia*, Left Ventricular Ejection Fraction ("LVEF"), a surrogate measure used to diagnose and monitor heart failure, representing the percentage of oxygen-rich blood pumped out of the heart's main pumping chamber (left ventricle, or "LV"), with lower percentages signaling a weaker pump; LV End-Systolic Volume ("LVESV"), a surrogate measure used to assess heart health and predict outcomes in various cardiovascular diseases, representing the volume of blood remaining in the LV at the end of contraction, with higher volumes often signaling poorer function; and LV End-Diastolic Volume ("LVEDV"), a surrogate measure of cardiac preload, representing the volume of blood in the heart's LV right before it contracts, indicating how much the heart stretches or fills during relaxation and how effectively it pumps during contraction.

128.   In July 2019, Capricor reported interim results from HOPE-2 which, according to the Company, showed meaningful results across several independent clinical measures. Specifically, the interim analysis focused on preliminary topline

data from a total of 17 patients (10 placebo and 7 treated) analyzed at the 3-month time-point and 12 patients (6 placebo and 6 treated) analyzed at 6 months.

129.   On May 13, 2020, Capricor reported final topline 12-month results for the total HOPE-2 patient population (12 placebo and 8 treated). According to the Company, the data showed some improvements in upper limb, cardiac and respiratory functions with p-values of less than p=0.05 in multiple measures. Specifically, according to Capricor, the data also showed statistically meaningful improvements in the later specified, full PUL 2.0 score in CAP-1002 treated patients with a mean change of 2.4 points over placebo patients (p=0.05). However, Capricor reported missing its primary efficacy endpoint, lacking statistical significance in the mid-level PUL 1.2 in CAP-1002 treated patients with a mean change of 2.8 points over placebo patients (p=0.08).

130.   Then, in August 2021, Capricor reported a new dataset (subsequently published in September 2021) including *post hoc* statistical analysis of HOPE-2 now showing that with *post hoc* statistical adjustments the trial data met the primary efficacy endpoint of mid-level PUL 1.2, the exploratory cardiac efficacy endpoint of LVESV, indexed, and showed improved statistical significance for the secondary efficacy endpoint of Full PUL 2.0 and exploratory cardiac efficacy endpoints of LVEF and LVEDV, indexed.

131.   In pertinent part, according to Capricor, under this *post hoc* analysis LVEF decreased in the placebo group over time, but improved in the CAP-1002 group, showing a 107% slowing of progression of cardiac disease (p=0.002). Additionally, the data reportedly suggested global improvements in cardiac function as measured by indexed volumes (LVESV, LVEDV).

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3.      *HOPE-2 Open Label Extension – Completed Enrollment in 2H 2020 with Data Readouts Annually*

132.    In addition to the HOPE-2 clinical trial, in or around May 2020, Capricor initiated an Open Label Extension, or OLE, available to all patients who participated in the HOPE-2 trial, including those patients who received placebo.

133.    An Open-Label Extension study allows participants who finished a main clinical trial to continue receiving, or for those who had received a placebo, begin receiving, the active study drug. All patient participants in an OLE study are given the study drug, and both they and the investigators know this.  As a result, OLE studies are not considered well-designed for purposes of providing pivotal clinical data, are subject to both investigator and participant bias, and are generally considered to provide only supplemental long-term data on safety, tolerability, and effectiveness in a real-world setting with an undefined end date.

134.    By the third quarter of 2020, Capricor announced that 13 patients enrolled in HOPE-2 had elected to continue under HOPE-2 OLE, including 6 patients originally randomized to receive CAP-1002 during HOPE-2, and 7 who originally received a placebo. One HOPE-2 OLE patient withdrew consent in the first year, reducing the total participant number to 12 for the remainder of the study.

135.    According to Capricor, after the completion of each patient's dosing schedule for the HOPE-2 clinical trial, all participating HOPE-2 OLE patients stopped treatment for an average 392 days before receiving OLE treatment, which is referred to as the gap phase. Thereafter, the HOPE-2 OLE participants received CAP-1002 (150 million CDCs per infusion) every three months.

136.    In June 2022, the Company announced positive one-year results from HOPE-2 OLE showing statistically significant improvements on the Full PUL 2.0 scale for patients on CAP-1002 testing three different hypotheses of treatment benefit during the ongoing OLE study. Such hypothesis testing, or exploratory

significance testing included, *inter alia*, measuring the difference in the Full PUL 2.0 in the OLE treatment group when compared to the original rate of decline of the placebo group from the HOPE-2 clinical trial after one-year (p=0.015); and measuring the difference in the Full PUL 2.0 in the OLE treatment group when compared to the rate of decline of the placebo group from the HOPE-2 clinical trial during the gap phase after the HOPE-2 trial (p=0.006).

137.   At the two-year timepoint, Capricor reported that HOPE-2 OLE data showed statistically significant differences in the Full PUL 2.0 in the participating OLE treatment group when compared to the original rate of decline of the placebo group from the HOPE-2 clinical trial after one-year, although at a lower level of statistical significance than the prior measurement (p=0.021). Additionally, Capricor reported that CAP-1002 continued to yield a consistent safety profile and was well-tolerated.

138.   A year into the HOPE-2 OLE study, Capricor also began recording measures of cardiac function, reporting that LVEF was measured using cardiac magnetic resonance imaging (cMRI). According to Capricor, six of nine patients enrolled in HOPE-2 OLE showed improvements in heart function when compared to their final assessment at the end of the HOPE-2 clinical trial.

139.   In May 2024, Capricor presented positive 3-year results from HOPE-2 OLE to support the continuing safety and efficacy of CAP-1002. According to the Company, the 3-year results showed a statistically significant benefit (+3.7 points, p=<0.001) in the Full PUL 2.0 in the OLE treatment group when now compared to an external comparator dataset of similar DMD patients collected by Vanderbilt University Medical Center.

140.   Capricor also reported that the HOPE-2 OLE data showed significant improvements in multiple cardiac measures, including LVEF, as well as indexed volumes when compared to the external comparator dataset. Specifically, Capricor

reported seeing a 4% improvement in LVEF, which is "the gold standard of cardiac function and HOPE-2," according to Defendant Marbán.

    4.     *HOPE 3 – Completed Enrollment for Cohort A in 2H 2023 and Cohort B in 1H 2024; Topline Analysis in December 2025*

141. In January 2022, Capricor entered into a Commercialization and Distribution Agreement (the "NS Distribution Agreement") with Nippon Shinyaku Co., Ltd. ("Nippon"), a Japanese pharmaceutical company listed on the Tokyo Stock Exchange (US subsidiary: NS Pharma, Inc.), for the exclusive commercialization and distribution of CAP-1002 for DMD in the United States.

142. Under the terms of this agreement, Capricor received a $30.0 million upfront payment from Nippon, which it used to fund the pivotal Phase III clinical trial to validate CAP-1002 for the treatment of DMD ("HOPE-3") and was entitled to receive other potential milestone-based payments of up to $705 million to support the clinical development of CAP-1002 in DMD.

143. HOPE-3, a randomized, double-blind, placebo-controlled study, was originally designed to enroll 68 patients at approximately 15-20 investigative sites in the United States. HOPE-3 participants were to be randomized to either CAP-1002 or placebo in a 1:1 ratio. The active arm of participants in the HOPE-3 trial received IV infusions of CAP-1002 (150 million CDCs per infusion) every 3 months for a total of 4 doses – over a one-year period.

144. Like the HOPE-2 clinical trial, HOPE-3 was designed to evaluate repeat, intravenous doses of CAP-1002 in boys and young men with evidence of skeletal muscle impairment regardless of ambulatory status and who were on a stable regimen of systemic glucocorticoids. Unlike the HOPE-2 clinical trial, the pre-specified primary outcome measure for HOPE-3 was Full PUL 2.0 at one-year. HOPE-3 also measured various secondary endpoints, including cardiac function.

145.   Initially, HOPE-3 was to provide pivotal clinical validation of the safety and efficacy of CAP-1002 to support marketing approval in the U.S. Indeed, when announcing the first HOPE-3 patient dosing in July 2022, Defendant Marbán professed, "[t]he data from our Phase 2 clinical trial *suggest* that CAP-1002 can slow loss of function by as much as 70% in terms of upper limb skeletal muscle function. Since there are very limited therapeutic options for these patients and CAP-1002 has been shown to be safe and effective, we are pleased to begin this pivotal trial with the goal of achieving regulatory approval as quickly as possible."

146.   By the end of the first quarter 2023, Capricor had enrolled roughly 30% of the pre-defined HOPE-3 patient population. Around this time, however, Capricor participated in a formal meeting with the FDA where it discussed the Company's plans with respect to commercial manufacturing activities for CAP-1002, including its potency assay and other product release criteria to support commercialization. Following this meeting, Capricor announced that it would need to add additional patients to HOPE-3 who would be treated with product manufactured at its new San Diego facility (as opposed to its existing clinical manufacturing facility located in Los Angeles), in order to support a potential BLA. Thus, at all relevant times, Capricor had actual knowledge that clinical trials involving a significant patient population would be required to obtain FDA approval for CAP-1002.

147.   In July 2023, Capricor had a Type B clinical meeting with the FDA where, according to Capricor, the FDA affirmed alignment on its redesigned HOPE-3 trial, which now consisted of two subpopulations referred to as "Cohort A" and "Cohort B." Cohort A consisted of any participants receiving CAP-1002 product manufactured at Capricor's Los Angeles facility and Cohort B included any participants receiving CAP-1002 manufactured at the San Diego facility.

148.    As part of the study redesign, Capricor's original enrollment target for Cohort A was reduced from 68 to 58 patients and was to support a BLA. Cohort B was designed to enroll 44 patients and support inclusion of the Company's San Diego site following initial marketing approval. The enrollment criteria and patient dosing was the same for both cohorts of HOPE-3.

149.    Capricor met its target of 58 patients enrolled in Cohort A by the end of the third quarter 2023, and with an additional 3 patients enrolled thereafter (n=61), enrollment of Cohort A was considered complete as of November 2023. A primary analysis of efficacy and safety was originally to be performed for each individual cohort at 12 months, with topline data from Cohort A expected in the fourth quarter of 2024.

150.    Enrollment for Cohort B commenced in December 2023, completed in the second quarter of 2024. With the last patient visit reportedly occurring in June 2025, topline data from Cohort B was expected in the third quarter of 2025.

151.    However, as detailed below, at the start of the Class Period, Capricor announced its plans to combine Cohorts A and B, delaying the topline readout for the HOPE-3 clinical trial until December 2025.

**H.    The FDA's Consistent Guidance on Phase III Clinical Data Necessary to Demonstrate Substantial Evidence of Effectiveness**

152.    As detailed above, CAP-1002's RMAT designation afforded Capricor more frequent meetings with the FDA to discuss the product's development plan and ensure collection of appropriate data needed to support marketing approval as well as more frequent written communication from the FDA about such things as the design of its clinical trials to help guide the development of evidence needed to support approval as efficiently as possible.

153.    Indeed, throughout the course of the clinical development of CAP-1002 for the treatment of DMD, Capricor had at least 10 formal meetings with the

FDA and many more informal meetings, teleconferences, and written communications to discuss the approval pathway for this product. At every turn, Capricor remained relentless in pursuing the quickest clinical path to gathering the information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the product and to provide an adequate basis for marketing approval.

154.    While the FDA frequently reiterated its willingness to work with Capricor on its mission to get CAP-1002 to market quickly, the FDA consistently and without falter advised the Company to conduct a pivotal Phase III trial to demonstrate substantial evidence of effectiveness from an adequate and well-controlled study to support a BLA, as required under Section 505(d) of the FD&C Act, 21 CFR § 314.126, and Section 351 of the PHS Act.

155.    Such guidance was instructed by the FDA's longstanding position that the Phase II HOPE-2 trial, was not designed as an adequate and well-controlled clinical investigation (consistent with the Company's July 2022 admission that HOPE-2 only "suggested" not proved a substantial clinical benefit, *see* ¶145, *supra*), and as completed, did not provide the substantial evidence of effectiveness necessary to support approval of CAP-1002. For example, in December 2018, Capricor met with the FDA as part of the expedited review afforded under CAP-1002's RMAT designation. During this discussion, which, according to Capricor, was reflected in subsequent meeting minutes issued by the FDA, Capricor asked whether the FDA would agree if HOPE-2 could serve as a registration study if the trial provided evidence that CAP-1002 is safe and effective in treating DMD. The FDA advised Capricor to request an End-of-Phase II meeting after completion of the trial to determine whether HOPE-2 could serve as the registration study (*i.e.*, the adequate and well-controlled clinical investigation providing the primary basis

for determining whether there is substantial evidence to support the claims of effectiveness for CAP-1002).

156.    Subsequently, during Capricor's requested Type B End-of-Phase II meeting with the FDA to discuss its later-added 6-month interim analysis of HOPE-2, conducted in October 2019, Defendants proposed the possibility of Accelerated Approval for CAP-1002. As reported by the Company, the FDA rejected this proposal noting that the Phase II HOPE-2 clinical trial was designed as an exploratory trial and that the 6-month data from HOPE-2 did not provide substantial evidence of effectiveness to support a future BLA. The FDA did, however, indicate its support for conducting a Phase III trial of CAP-1002 for the treatment of DMD based on the HOPE-2 interim results.

157.    From a regulatory perspective, "exploratory" trials are the early-stage, small-scale studies focused on generating hypotheses, assessing initial safety, finding optimal doses, and guiding future designs. Comparatively, "pivotal" trials (typically Phase III) are the late-stage, large-scale confirmatory studies designed to prove a treatment's efficacy and safety for widespread use. It is well understood that "pivotal" trials are the adequate and well-controlled clinical investigations designed to serve as the basis for the FDA reaching a conclusion that there is substantial evidence of effectiveness to decide whether to approve a drug.

158.    Following the May 2020 release of the topline 12-month results from HOPE-2, which showed the study missed its primary efficacy endpoint of mid-level PUL 1.2 and its secondary cardiac-related endpoints, Capricor requested a follow-on to its October 2019 Type-B End-of-Phase II meeting, completed before the end of June 2020. During this meeting, Capricor discussed the DMD program, next steps, and an expedited pathway to approval of a BLA for CAP-1002. Specifically, Capricor again raised the question of an Accelerated Approval pathway for CAP-1002 for the treatment of DMD focusing on the final topline 12-

month data from HOPE-2. According to Capricor, however, consistent with its previous disclosures, the FDA continued to advise the Company to conduct a Phase III clinical trial of CAP-1002 for DMD to support a BLA.

159.   During this meeting, Capricor also requested an additional meeting to clarify endpoints for any future clinical trials. According to the Company, in a written response, the FDA supported the use of the Full PUL 2.0 from baseline to twelve months as a primary efficacy endpoint as long as clinical meaningfulness can be demonstrated. Capricor also asserted that the FDA suggested that a 1.0-point difference appeared suitable to demonstrate product efficacy to support a BLA.

160.   Throughout the third and fourth quarter of 2020, Capricor reiterated ongoing discussions with the FDA regarding its pathway forward for the DMD program and maintained that its further plans with respect to the clinical development of CAP-1002, including its decision to conduct a Phase III trial, would be based on the final guidance received from the FDA, its ability to secure funding necessary to conduct a Phase III trial should it decide to pursue that path and/or its ability to partner with another company to advance the development of CAP-1002.

161.   Then, in May 2021, the Company announced that it had recently submitted a new data package to the FDA for which it requested an additional Type B End-of-Phase II meeting, completed before the end of June 2021. During this meeting, Capricor presented its new data package, including a revised statistical analysis of HOPE-2 under which it met its primary efficacy endpoint of mid-level PUL 1.2 and its secondary cardiac endpoints of LVEF and LVESV, indexed, as well as showed improved significance for its secondary endpoint of Full PUL 2.0. Based on this new dataset, Capricor again questioned the FDA about an expedited path towards regulatory approval of CAP-1002. However, according to Capricor, the FDA continued to advise Capricor to conduct a Phase III trial to support a BLA.

162.    Specifically, when discussing the May 2021 follow-on meeting with investors, Defendant Marbán provided that "although it was a productive discussion, the consensus was [th]at we should proceed to a Phase III clinical study. The principal thinking was that the size of the HOPE-2 data set with 20 patients [including 12 placebo patients and 8 patients treated with CAP-1002] was relatively small. We now plan to move forward with a Phase III pivotal trial."

163.    Likewise, the FDA's messaging to Capricor regarding the necessity of a pivotal Phase III trial to support any future BLA continued even as the Company tried pushing HOPE-2 OLE data as supportive evidence. For example, after the Company announced the 12-month interim data from HOPE-2 OLE in June 2022, Defendant Marbán asserted that "[b]ased on our regulatory designations of RMAT [ ] and orphan disease designation and also the importance of this data to people of DMD, we are requesting a meeting with FDA, which should occur this year to present this open-label extension data, which we believe will further support our path forward towards potential regulatory approval." However, rather than granting Capricor a meeting to discuss the HOPE-2 OLE data, the FDA told the Company to just submit the full data set for its review and instructed Capricor to remain focused on completing its pivotal Phase III HOPE-3 trial.

164.    During the Question-and-Answer portion of Capricor's investor conference call to discuss the financial results for the third quarter 2022, held on November 10, 2022, Defendant Marbán was explicitly asked to provide "transparency on where you see approval with accelerated should you get it versus full review because I know some of those state[ment]s didn't match up before," to which she responded:

> Yes. So we have been pretty clear in our messaging. We continue to work with FDA. We have been brok[er]ing the idea with them since HOPE-2, that we think that CAP-1002 would be an ideal candidate for accelerated approval, it's very safe, and also has tremendous efficacy. And our current open-label extension data shows what we and others

consider to be disease modification. So time is muscle, and we want to get it to the patients as soon as possible.

Now having said all that, *FDA has been very clear on what they want us to do, what they told us to do is to do HOPE-3*. As I said a minute ago, I'll say it again, heads down HOPE-3. *Our focus entirely is on enrolling this trial and achieving what FDA has asked us to do, which is to do an adequate, well-controlled Phase III clinical trial.* However, we will not give up our conversations with them. We will continue to work with them. We have RMAT designation as well as other types of preferred opportunities for accessing FDA. So we will, at certain targeted points, not yet disclosed, continue to meet with FDA and see if there is a way to push forward for accelerated approval, if that's helpful at all [].

165. FDA messaging remained the same even after Capricor redefined HOPE-3 to include a subpopulation of participants receiving CAP-1002 product manufactured at its commercial-scale San Diego facility. For example, Capricor participated in a Type B clinical meeting with the FDA in July 2023 to discuss the addition of Cohort B to HOPE-3. Following this meeting, Capricor reported that "*based on the feedback from FDA, we plan to submit a [BLA], supported by results from Cohort A*…" with Cohort B to "support inclusion of our San Diego site following initial registration."

166. Then again, in November 2023, when discussing the completed enrollment of Cohort A for the pivotal Phase III HOPE-3 trial, Defendant Marbán further reiterated the agency's consistent guidance on the Company's path to regulatory approval of CAP-1002 providing that, "*FDA has been absolutely strong on the fact that they want to see the fully enrolled [HOPE-3] trial before they would ever consider accelerated approval.* So we consider that we checked that box now."

167. Accordingly, for years the FDA consistently told Capricor that the HOPE-2 Phase II trial, as completed, lacked a sufficient patient enrollment to satisfy the "adequate" portion of an adequate and well-controlled clinical

47

investigation, and as later revealed, raised repeated concerns about trial's efficacy data, achieving statistical significance only on numerous *post hoc* analyses and calling into question the "well-controlled" portion of the trial. Moreover, the FDA repeatedly advised Capricor that an adequate and well-controlled clinical investigation was necessary to establish the statutorily required substantial evidence of effectiveness for any future BLA for CAP-1002, consistently instructing Capricor to conduct the pivotal HOPE 3 Phase III trial under such guidance. As such, the only question remaining, following the completed enrollment of HOPE 3, was whether the FDA would advise Capricor that this clinical data would be needed as primary support for a BLA submitted for Traditional (or Full) Approval or could be used as a confirmatory study in support of a BLA seeking Accelerated Approval.

## I.    Capricor's pre-BLA Meeting with the FDA

168.    In late May 2024, with Cohort A of the HOPE-3 trial fully enrolled and Cohort B enrollment nearing completion, Capricor had a Type-B meeting with the FDA to discuss scheduling a pre-BLA meeting and the opportunity for Rolling Review of any BLA submitted for CAP-1002 based on its RMAT designation.

169.    The primary purpose of a pre-BLA meeting is to discuss the planned content of the marketing application. According to the FDA, the pre-BLA meeting is an opportunity to:

- identify any major unresolved issues from the development program,
- familiarize the review team with the studies the applicant is planning to rely on to provide evidence of the product's effectiveness,
- identify the status of ongoing or needed studies adequate to assess pediatric safety and effectiveness,
- acquaint FDA reviewers with the general information to be submitted in the marketing application,

- discuss appropriate methods for statistical analysis of the data,

- discuss the best approach to the presentation and formatting of data in the marketing application, and

- discuss CMC readiness for a BLA, *e.g.*, commercial manufacturing process, and product comparability (if applicable).

170. Only one pre-BLA meeting will be granted for a specific product or indication. Generally, the pre-BLA meeting should occur not less than two months prior to the planned submission of the original BLA or efficacy supplement.

171. Based on the purpose of the meeting identified above, the FDA instructs the sponsor to plan to include adequate information to allow sufficient discussion at the meeting to support a complete BLA submission. For example, the sponsor should provide topline results from the clinical studies that are intended to provide the primary evidence of effectiveness and an overview of the safety database (*e.g.*, total number of subjects exposed to the proposed recommended dose/regimen; most common adverse events; serious adverse events; and special interest events).

172. Following the pre-BLA meeting, the FDA will issue a written summary within 30 days. This summary is considered an official and final record of the meeting that focuses on any clarifications of unclear preliminary responses, agreements and disagreements, and action items as discussed during the meeting.

173. Capricor participated in a pre-BLA meeting with the FDA in the first week of August 2024. During the Company's investor conference call to discuss the financial results for the quarter ended June 30, 2024, held on August 7, 2024, Defendant Marbán recapped the pre-BLA meeting stating, in pertinent part:

> [W]hile we are awaiting final minutes from the meeting, I can share that we are discussing alternative paths to our BLA filing. One pathway would be filing our BLA with currently available data from the HOPE-2 and the HOPE-2 OLE studies to support an accelerated approval pathway with confirmatory data to be provided at a later date [(*i.e.*,

HOPE-3)]. Another option is a traditional full approval. We are pleased to announce FDA's acceptance of our rolling BLA submission, and based on that, Capricor intends to initiate the filing of our BLA shortly.

174.   That same month, Capricor participated in a series of follow-up informal meetings to discuss, according to Defendant Marbán, "the best path forward, both for those with DMD, for Capricor and also for the field in general."

175.   Unbeknownst to the public, during the course of Capricor's pre-BLA meeting and subsequent follow up meetings, the FDA determined that CAP-1002 for the treatment of DMD did not qualify for the Accelerated Approval pathway. As a result, the only option for this complete DMD indication was an application for Traditional Approval, providing data from the adequate and well-controlled HOPE-3 trial as primary evidence of effectiveness to support the BLA.

176.   At this time, however, the FDA and Capricor had also solidified the statistical analysis plan (SAP) for HOPE-3 which included combining Cohort A and Cohort B data for primary analysis of efficacy and safety to be performed at 12 months. Specifically, there was concern about the potency assay of the drug product manufactured at the Company's Los Angeles facility, adversely impacting its effectiveness and jeopardizing the likelihood of meeting its primary endpoint for Cohort A. Because of this, Capricor built an SAP that would allow it to look at Cohort A plus Cohort B, but also afforded the option of establishing primary analysis based on Cohort B only, should it not achieve significance with Cohort A plus Cohort B. In doing so, primary efficacy data for the HOPE-3 trial would not be available until the second half of 2025.

177.   As later confirmed post-Class Period, Capricor was able to hit its primary endpoint for HOPE-3 on Cohort A plus Cohort B, but Cohort B did better than Cohort A. Defendant Marbán attributed Cohort B's success to the stringent quality assurance and quality control measures in place at the San Diego facility

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

stating, "every batch of drug that comes out of San Diego goes through a much more rigorous type of evaluation than from our Los Angeles facility."

178.    Because there were no approved therapies for DMD-associated cardiomyopathy, Capricor pivoted to discussing the potential expedited regulatory approval path for this narrowed indication for CAP-1002, based on existing clinical data from HOPE-2 and confirmatory evidence from the HOPE-2 OLE study and natural history data from the external comparator groups.

179.    However, the FDA's position that, with HOPE-2 clinical data alone, Capricor lacked substantial evidence of effectiveness from an adequate and well-controlled clinical trial, remained unchanged. As such, throughout these meetings, the FDA advised Capricor that it could proceed with a cardiac focused indication using HOPE-2 clinical trial data, substantiated by HOPE-2 OLE real world data and natural history data as evidence of effectiveness, but only with the commitment to provide pivotal HOPE-3 data once it became available; it never agreed that the Company's then-existing limited, exploratory clinical data accompanied by highly-subjectable and likely biased confirmatory evidence was sufficient to support a full BLA. The FDA granted Rolling Review based on this understanding.

**J.    Capricor's Non-Compliance with cGMP Standards**

180.    To make matters worse, Capricor's San Diego facility, responsible for manufacturing CAP-1002 upon potential product approval, was not compliant with cGMP. As detailed above, a critical aspect to successfully achieving BLA approval is meeting all CMC requirements as outlined by the FDA.

181.    A pre-license inspection (PLI) is necessary for licensure under the Code of Federal Regulations. Any sponsor submitting a BLA is supposed to be ready for an inspection at the time of their submission. So, in theory, CBER could inspect immediately after the application or the supplement is received. But, that is not preferred, because when inspections occur, CBER wants the investigator to see

all pertinent operations at the facility. To ensure this, the sponsor is contacted so they can check their production schedule to find an appropriate time for the inspection. Because the sponsor is aware of the pending inspection, it can update CBER if there are any problems requiring a delay with the inspection.

182.   There are three objectives to a PLI: (1) determine whether the establishment(s) has a quality system that is designed to achieve sufficient control over the facility and commercial manufacturing operations; (2) verify that the formulation, manufacturing or processing methods, and analytical (or examination) methods are consistent with descriptions contained in the CMC section of the application for the biobatch (and other pivotal clinical batches, when applicable), the proposed commercial scale batch, and the API(s); and (3) audit the raw data, hardcopy or electronic, to authenticate the data submitted in the CMC section of the application and verify that all relevant data (*e.g.*, stability, biobatch data) were submitted in the CMC section such that CBER product reviewers can rely on the submitted data as complete and accurate.

183.   After the FDA conducts a PLI, in rare instances, it will issue documentation of observations, known as an FDA Form 483. The FDA issues a Form 483 when an FDA inspector observes conditions that may constitute violations of the FD&C Act, other Acts, or FDA regulations. If the investigators have not observed any problems at the facility, they will not issue a Form 483.

184.   If a Form 483 is issued and the sponsor wants to get licensed, they will need to respond to the observations and mitigate the concerns raised by the inspectors. This is part of the review process and is essentially the same as an information request letter based on CBER's review of the application. These concerns need to be addressed before the application can be approved.

185.   A Form 483 is not intended to comprehensively list every minor violation, but rather those that are "significant" and, in the investigator's view,

could cause the manufactured drugs to become "adulterated or rendered injurious to health."[15]  At the conclusion of the inspection, the Form 483 is presented to and discussed with the facility's senior management. *Id*. Form 483's are relatively rare. As the FDA notes, "more than 90% of inspections found facilities to have acceptable cGMP compliance."[16]

186.    Further, the inspection is only one part of the approval process. At the conclusion of a PLI, the lead investigator will either recommend approval of the application, as to the CMC section, or recommend withholding of approval. An approval recommendation from the lead investigator indicates that the inspection found no significant issues. A recommendation to withhold approval indicates that the FDA investigators observed that the site is not cGMP compliant, information in the CMC section is not consistent with site records, or information submitted is not accurate and complete.

187.    On December 31, 2024, Capricor submitted the CMC section of its BLA, identifying its San Diego facility as the intended commercial manufacturer of CAP-1002 upon approval, making it the subject of FDA inspection and requiring cGMP compliance. As detailed by multiple former employees of Capricor, at the time of the BLA submission, however, there was widespread concern within Capricor that the application would be rejected because of rampant and unresolved CMC deficiencies and cGMP non-compliance at the San Diego facility.

188.    Confidential Witness No. 1 ("CW1") worked for Capricor as its Facilities Manager, between October 2023 and August 2024. CW1 initially reported to Chief Operating and Science Officer ("CSO"), Kristi Elliot, who in turn reported to Defendant Marbán, and then to Vice President of Program

---

[15] *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.

[16] *See* https://www.fda.gov/drugs/guidance-compliance-regulatory-information/pharmaceutical-inspections-and-compliance.

Management, Operations & Quality, Jonathan Tayco. CW1 worked out of Capricor's San Diego facility and oversaw the San Diego and Los Angeles facilities. CW1's responsibilities involved ensuring that the Company's facilities, equipment, and maintenance programs met cGMP standards.

189.    During their employment at Capricor, CW1 attended routine meetings with Capricor executives, including Ms. Elliot, Mr. Tayco, Vice President of CMC Operations, Tristin McGuffick, and sometimes Ms. Marbán. In those meetings, Capricor executives discussed what the FDA would look for when assessing the quality of Capricor's facilities.

190.    According to CW1, CW1 noticed problems with the quality of Capricor's facilities almost immediately after they began working at Capricor. Within the first few months of starting in October 2023, CW1 met with Ms. Marbán and conveyed to her the issues at the Capricor facilities. Shortly thereafter, CW1 was transferred to work under Mr. Tayco.

191.    Subsequently, throughout their tenure with the Company, CW1 raised several safety concerns as well as facility design concerns to management but, according to CW1, they went unanswered.

192.    Specifically, CW1 noted that Capricor used material that was not cGMP grade when constructing the filters used in the Company's manufacturing processes. CW1 raised the filter issue with Ms. Elliot and Mr. Tayco, who were dismissive of CW1's concerns. According to CW1, the filter issue alone would take Capricor months to resolve.

193.    CW1 also noted that the airflow in the clean room of the San Diego facility was flawed – an issue raised in the meetings with Capricor executives.

194.    Cleanrooms are used in industries requiring ultra-low levels of airborne particles, dust, microbes, and contaminants to ensure product quality, research integrity, or public safety, crucial for manufacturing pharmaceuticals.

195.    Inside a cleanroom facility, different interconnected rooms manage contamination. Negative airflow must be maintained, so that external airborne contaminants cannot enter and internal airborne contaminants do not stagnate. Thus, the layout of the clean suite at these manufacturing facilities should facilitate maintaining cleanliness class, pressure differentials, and temperature/humidity conditions by isolating critical spaces and by excluding non-clean operations.

196.    CW1 stated that the airflow issue at the Company's San Deigo facility had progressed so much that, a month or two before CW1's departure from Capricor in August 2024, mold was found in one of the CAP-1002 drug samples.

197.    Further, according to CW1, the server that contained Capricor's product and manufacturing information was installed next to the nitrogen system, causing condensation and rust, and thereby putting this critical information at risk. CW1 raised their concerns about this data security risk with Ms. Elliot but was told that Capricor did not want to pay to relocate the server and install systems that ensured a secure network.

198.    CW1 additionally observed that Capricor had not done testing needed to define the tolerances for the equipment used to produce CAP-1002 at the San Diego facility, and therefore, the Company did not know the true failure rate for the manufacture of CAP-1002. Accordingly, without product-specific testing, CW1 stated that Capricor could not know how CAP-1002 should be stored or handled.

199.    Consequently, CW1 stated that Capricor's facilities and equipment were not close to being cGMP compliant. As a result, CW1 said the Company was not ready for the FDA inspection when they left in August 2024, and the Company's lack of readiness was the reason for CW1's departure. By their estimation, it would have taken the Company at least a year to reach the level of compliance needed to pass the BLA. According to CW1, several employees

focused on cGMP compliance were concerned that the BLA would be rejected, including CW1 and CW1's supervisor, Mr. Tayco.

200. CW1 described attending a meeting during their last month at Capricor where every department at the Company documented its concerns about meeting FDA standards. CW1 said that everybody who was in some sort of management position attended this meeting. According to CW1, each department had written down on Post-it notes the top five or six outstanding or unresolved issues that needed to be resolved to ensure that the San Diego facility met cGMP standards, which they then stuck to a huge board. CW1 said Mr. Tayco took a picture of the board with all the Post-its on it. The number of unresolved issues was overwhelming, CW1 said.

201. Confidential Witness No. 2 ("CW2") was employed by Capricor as a Compliance Specialist between November 2024 and February 2025. During their tenure with the Company, CW2 indirectly reported to Senior Vice President of Quality Control, Minghao Sun, who in turn reported to Defendant Marbán. CW2 said they were specifically hired to help the Company prepare for the pre-license inspection. CW2 worked out of the Company's San Diego facility.

202. During their employment, CW2 attended "all-hands" meetings, roughly monthly, that included Defendant Marbán and other executive leadership in Research & Development at the Company. Like CW1, CW2 said Capricor management often ignored advice from people with FDA experience, like CW2.

203. According to CW2, Capricor had serious workflow problems that affected risk management, and the layout of the San Diego facility made product contamination more likely. Specifically, CW2 described a lack of quality control between the interconnected rooms at the San Diego facility. CW2 outlined the example of Capricor employees entering certain passageways where other

employees were working, then going out one door and back in another, which CW2 said did not constitute proper sterilization of the product.

204.    CW2 also said that the Company's data controls were weak and its quality system was deficient and incomplete. For example, during their tenure with the Company, CW2 observed Capricor employees often left computers unlocked and unattended, which CW2 said was a major FDA concern because, in doing so, data integrity is compromised severely.

205.    In addition, according to CW2, Capricor had purchased QT9 software to automate compliance and manage its quality control processes. CW2 said QT9 itself was very primitive and likely chosen for cost reasons. Worse yet, when CW2 began working at Capricor in November 2024 (one month before Capricor submitted the CMC section of the BLA to the FDA), it still had never built out the audit tools needed to track cGMP compliance. There was no module for the audits at all, CW2 said. According to CW2, they were hired to create that system so the Company could start testing its readiness for inspection. CW2 said that this was a major concern for CW2 given how close the Company was to the FDA inspection.

206.    During their tenure, CW2 was also tasked with helping prepare Capricor for a mock inspection. According to CW2, the Company held a mock inspection of the San Diego manufacturing facility in January 2025, conducted by retired FDA auditors and employees from the Company's Los Angeles facility. When asked how the mock inspection went, CW2 said it could have gone better. CW2 used the word "chaos" to describe the mock inspection.

**K.    Capricor's Full BLA for DMD-Associated Cardiomyopathy**

207.    Despite explicit instruction by the FDA regarding the inclusion of pivotal Phase III HOPE-3 clinical data with any BLA submitted for CAP-1002 and significant outstanding CMC deficiencies and cGMP non-compliance impacting the readiness of Capricor's San Diego facility, on September 24, 2024 (the first day

of the Class Period), Defendants announced its decision to file a BLA seeking full approval of CAP-1002 with the proposed indication for treatment of DMD-associated cardiomyopathy based exclusively on existing cardiac data from the Phase II HOPE-2 clinical trial and HOPE-2 OLE results compared to natural history data provided by Vanderbilt University Medical Center and Cincinnati Children's Hospital Medical Center.

208. Defendant Marbán justified the sudden shift in indication by suggesting that the FDA had acceded to the approach, stating, "[t]here are currently no approved therapies for DMD cardiomyopathy, which is the leading cause of death in those with Duchenne. Based on the strength of our cardiac data, combined with the FDA's commitment to advancing therapeutics for the treatment of rare diseases, we are seeking approval for the cardiomyopathy associated with DMD and will look to expand the label for skeletal muscle myopathy post-approval."

209. She further supported this decision by claiming it was "the result of multiple in-depth meetings with FDA where we showed robust and positive cardiac data from our HOPE-2 and HOPE-2 OLE studies compared to natural history data from a large cohort of patients."

210. Analysts and investors alike were deceived by Capricor's unbalanced and inaccurate portrayal of regulatory communications in this announcement. On this news, Capricor's stock price jumped from a closing price of $5.97 per share on September 23, 2024 to $9.10 per share at close on September 24, before rising even further to close at $10.34 per share on September 25, 2024, on unusually high trading volumes—representing a 42% increase in value in just two trading days.

211. On September 24, 2024, H.C. Wainwright & Co., LLC ("Wainright") issued a report entitled, "Heart to Heart with FDA; Cardimyopathy Takes Center Stage for Quicker BLA," providing a recap of the Company's "update on its

regulatory strategy for deramiocel (previously CAP-1002)." Specifically, the report summarized that:

> Following HOPE-2 (and OLE) data analysis, collection and comparison to DMD patient natural history data, and meetings with the FDA, the company will now file a BLA for full approval based on existing cardiac and natural history outcomes for deramiocel to treat all patients diagnosed with DMD-cardiomyopathy. Potential approval would take advantage of RMAT status as well as a large potential cash infusion from a PRV [Priority Review Voucher] sale.

212. Wainright went on to call this update "a very shrewd strategic shift for Capricor" and, echoing Defendants' sentiments, noted that, "[b]y focusing on DMD-cardiomyopathy the company is able to derisk and expedite its BLA submission plans, and could potentially bring deramiocel to market faster."

213. That same day, Ladenburg Thalmann & Co ("Ladenburg") issued an analyst report raising its price target from $25 to $39 for Capricor, providing that:

> Rather than going after a broad DMD indication, CAPR seems to play safe and try to win on the label that has the highest probability of success — potentially even without an Advisory Committee meeting, and with the same Priority Review accelerated process. On the surface, it may seem that deramiocel may be limited to DMD cardiomyopathy patients only, but published data suggest that 100% of DMD patients eventually develop cardiomyopathy, and that would mean deramiocel may be applied to all ages of DMD patients even before the cardiomyopathy symptoms are evident.

214. Ladenburg went on to note that, "the ongoing HOPE-3 Ph3 trial of deramiocel is not going to affect the FDA decision on deramiocel as HOPE-3 will be viewed not as a confirmatory but rather as an indication expansion trial" and declared that, "[i]n essence, the FDA and CAPR, with today's decision, decided to change the primary endpoints for the FDA's decision from Performance of Upper Limbs metrics to cardiomyopathy metrics, and this is a much safe route to approval given the properties of deramiocel."

215.   However, unbeknownst to the public, the FDA's position regarding the necessity of HOPE-3 to support a BLA for CAP-1002 had not changed, thus the FDA had not "agreed" to Capricor's submission of a *full* BLA for any indication without this pivotal Phase III trial data.

216.   Referring to the BLA, CW1 noted they did not think anyone at the Company had the expectation that it was going to go through. More specifically, CW1 said even before they left Capricor in August 2024, leadership had expressed doubt about the FDA approving the BLA based on the HOPE-2 data alone. CW1 recalled attending a hybrid meeting of the Company's core group of managerial teams, in or around July 2024, where Mr. Tayco communicated his concerns that HOPE-2 would not satisfy regulators. CW1 said Ms. Elliot and Mr. McGuffick were also at this meeting.

217.   Notwithstanding, Capricor completed its rolling submission of the CAP-1002 BLA sections on December 31, 2024, without pivotal HOPE-3 clinical data and, as detailed *supra*, without critical quality controls in place to ensure the CMC information submitted was complete and accurate.

218.   On March 4, 2025, Capricor announced that the FDA had completed its facial analysis of the application submitted, accepting the BLA for filing and had granted Priority Review with a PDUFA target action date of August 31, 2025.

219.   Defendants' decision to seek full approval without pivotal Phase III HOPE-3 data created an increased risk of rejection by the FDA, a risk that was concealed from investors until it materialized. Further, throughout the Class Period, Defendants continued to mislead the public about the strength of Capricor's existing HOPE-2 cardiac data as compared to and substantiated by natural history data, its regulatory communications and the status of its BLA, and the readiness of its intended commercial manufacturing facility and the risks associated therewith.

220.   For example, on March 19, 2025, when providing an update on recent developments with the DMD program, including the FDA's filing of the completed BLA submission seeking full approval of CAP-1002, Defendant Marbán reiterated, in pertinent part, "[t]he BLA submission for deramiocel included safety and efficacy data from Capricor's Phase 2 HOPE-2 placebo-controlled trial and the HOPE-2 open label extension (OLE) trial compared to natural history data from an FDA-funded and published dataset on the implications of DMD cardiomyopathy and potential biomarkers of disease progression." She went on to make the claim that, "Capricor's ongoing HOPE-3 Phase 3 study which is assessing skeletal muscle function has not been requested for review by the FDA for this application."

221.   Then, on May 5, 2025, Capricor issued a press release announcing it had completed its mid-cycle review meeting with the FDA. In pertinent part, Defendants announced that no significant deficiencies were identified by the Review Committee and that the package is on track for its PDUFA action date.

222.   Capricor later admitted to receiving *50* information requests (IR) from the FDA during the roughly 4-month long review period. Worse yet, at this point, the Company's PLI had already been scheduled and, as detailed above, Defendants knew the San Diego facility was not cGMP compliant, it lacked critical quality controls, and as result, was at severe risk of failing the inspection, subjecting the BLA to further risk of rejection by the FDA due to significant CMC deficiencies.

**L.    Capricor's Receipt of FDA Form 483 Citing CMC Deficiencies**

223.   The FDA conducted its PLI of the Company's San Diego manufacturing facility from May 27 to May 30, 2025. On May 30, 2025, the FDA issued a Form 483 to Capricor, and specifically addressed to CSO, Kristi Elliot.

224.   The Company's Form 483 noted numerous CMC violations including, for example, significant deviations in manufacturing conditions between that

described in the BLA and what was observed on-site at the San Diego facility including with the CAP-1002 product's formulation operations and qualification.

225.  In addition, the Form 483 identified certain spaces within the San Diego facility's cleanroom design that were "not maintained in a state of good repair." Thus, the airflow issues in the clean room at the San Diego facility that were identified by CW1, and corroborated by CW2's accounts of a contamination-prone workflow, persisted throughout the Class Period, were never remedied, and were identified as one of the critical reasons for the San Diego facility failing the PLI that led to the FDA issuing the Form 483.

226.  The Form 483 also highlighted that critical procedures applicable to Capricor's quality control unit were not in writing. Specifically, FDA investigators noted that "procedures for the receiving, evaluating, and documenting complaints related to [redacted] and for the handling evaluation, and disposition of returned [redacted] have not been established."

227.  A quality control unit in commercial biologics manufacturing ensures product safety, efficacy, and consistency by testing raw materials, in-process samples, and finished products against strict specifications, using advanced methods like cell-based assays to monitor critical attributes like potency, purity, identity, and sterility, all under cGMP.

228.  A quality control unit typically handles complaints by logging, investigating, and determining root causes, often involving returns for examination to assess product integrity, storage, and potential defects, leading to dispositions like scrap, rework/reprocess (if safe), return-to-supplier, or release, all documented to ensure compliance and trigger Corrective and Preventive Actions ("CAPA") for systemic improvements. CAPA in quality control are systematic processes to fix or correct current problems and stop or prevent future problems by identifying the

root cause, implementing solutions, and verifying effectiveness, crucial for preventing recurrence and improving overall quality management systems.

229.   Similarly, the Form 483 noted that Capricor failed to establish several quality agreements between its manufacturing facilities and component suppliers and other related third parties necessary to "delineate the roles, operational activities and responsibilities of each party to ensure compliance with CGMP."

230.   Where procedures had been written down, the Form 483 identified several occasions where such written procedures were not followed. For example, referring to CORP-QA-SOP-00166, Capricor's written "Deviations and CAPA Management SOP [Standard Operating Procedure]," providing that the trending and analysis of deviations should be performed by the quality control unit to identify recurrent issues, the FDA identified 27 deviations over a 2-year period.

231.   The same written procedure outlined the proper handling of nonconforming products ("NCPs") unless an extension is issued. The FDA identified, however, multiple outstanding NCPs without extension requests, with the oldest outstanding NCP initiated on May 10, 2023 (*i.e.*, more than two years outstanding).

232.   Under the same procedure corrective action reports ("CARs") were to be completed within a specified timeframe unless an extension was issued. CARs outline the systematic process for addressing NCPs, starting with problem identification, followed by detailed root cause analysis, containment, and implementing actions, including assigning responsibilities, setting timelines to verify effectiveness and ensure the identified issues do not recur. The FDA, however, identified at least three past-due CARs with no record of a requested extension.

233.   Thus, the issues resulting from Capricor's deficient and/or incomplete quality control system, as identified by CW2, persisted throughout the Class

Period, were never remedied, and resulted in several of the critical reasons for the San Diego facility failing the PLI that led to the FDA issuing the Form 483.

234.   Lastly, according to Capricor's written procedure CORP-QA-SOP-0109, "Good Documentation Practices," individuals creating, correcting, and presenting data generated during "GxP" must comply with ALCOA+ principles. ALCOA+ principles are data integrity guidelines from the FDA, extending the original ALCOA (Attributable, Legible, Contemporaneous, Original, Accurate) by adding Complete, Consistent, Enduring, and Available, ensuring data is trustworthy, traceable, and reliable throughout its lifecycle, especially crucial in pharmaceuticals, clinical trials, and regulated industries. However, in the Form 483, the FDA noted multiple deficiencies in Capricor's documentation, including entries that had been marked through and corrected without initials, date, or footnote, and at least two other documents containing missing entries.

235.   Thus, the data control issues at the San Diego facility that were identified by CW2, persisted throughout the Class Period, were never remedied, and were identified as one of the critical reasons for the San Diego facility failing the PLI that led to the FDA issuing the Form 483.

236.   Despite this knowledge, Defendants continued to mislead investors about the strength and readiness of the BLA throughout the Class Period. When discussing the outcome of the PLI of its San Diego facility with investors, Defendants described it as a "successful completion" and downplayed the significance and potential impact of the Form 483 by saying, "[t]he Company has submitted its responses to the FDA, none of which required material changes to the cGMP process or facility. The observations were primarily related to routine quality systems and documentation practices. The Company is confident that the facility will meet the necessary requirements to support product licensure and, pending approval, commercial launch."

237.   Even as late as June 20, 2025, Defendant Marbán made public claims that "[w]ith our BLA under priority review and several key regulatory steps now completed, we are executing with focus and urgency as we move toward potential approval. Our continued dialogue with the FDA remains on track with no evidence of any delays."

## M.    Capricor's Dire Financial Condition

238.   With no approved products, Capricor has historically financed its research and development activities as well as its operational expenses primarily from equity financings, government grants, and payments from distribution agreements and collaboration partners, like Nippon.

239.   Capricor's total cash, cash equivalents, and marketable securities as of June 30, 2024 were approximately $29.5 million, compared to approximately $39.5 million as of December 31, 2023. Capricor's decrease in cash, cash equivalents and marketable securities from December 31, 2023 to June 30, 2024 was primarily due to its operating expenses of approximately $30.7 million.

240.   According to Capricor, cash used in operating activities was roughly $13.6 million and $5.2 million for the six months ended June 30, 2024, and June 30, 2023, respectively. The Company reported that the increase of approximately $8.4 million in cash from operating activities was due to the receipt of its first milestone payment of $10.0 million from Nippon, which was triggered upon completion of the interim futility analysis of HOPE-3, and deferred revenue.

241.   Additionally, during the six months ended June 30, 2024, Capricor sold 777,679 shares of common stock at an average price of approximately $5.81 per share, resulting in net proceeds of approximately $4.3 million, pursuant to a Common Stock Sales Agreement in place with H.C. Wainwright & Co. LLC

(Wainright) under its at-the-market offering (the "ATM Program") with an aggregate offering price of up to $75.0 million.[17]

242. As of June 30, 2024, the Company had approximately $26.8 million in total liabilities, of which approximately $15.4 million related to deferred revenue, and approximately $8.3 million in net working capital.

243. Consequently, Capricor's Form 10-Q for the quarter ended June 30, 2024, filed with the SEC on August 8, 2024, reported that:

> Based on the Company's available cash resources and based upon the Company's projections for its operations, the Company does not have sufficient cash on hand to support current operations for at least the next twelve months from the date of filing this Quarterly Report on Form 10-Q. Therefore, there is a substantial doubt about the Company's ability to continue as a going concern.

244. Capricor took advantage of the positive receipts of its announcement to file a full BLA seeking approval of deramiocel for the treatment of DMD-associated cardiomyopathy to access much-needed capital to survive.

245. From June 21, 2021 through August 7, 2024, the Company sold an aggregate of 4,274,836 shares of common stock under the ATM Program at an average price of approximately $5.53 per share for gross proceeds of approximately $23.6 million. In other words, in the more than three years following the program's creation, Capricor had sold a mere 31% of all amounts available to be sold.

246. Capricor's cash needs became much more severe during the last four months of 2024. In the third quarter of 2024 alone, Capricor raised approximately

---

[17] At-the-market offerings are agreements by an issuer to sell at its discretion a certain number or dollar amount of shares each day to a sales firm at a slight discount to market price. The sales firm then resells the shares into the market. At-the-market offerings allow the issuer to "quickly raise capital by selling newly issued shares into the natural trading flow of the market, without having to market … the offering." *See* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2020/06/wtd--atm-offerings.pdf.

$52.2 million in net proceeds through issuances of 4,953,547 shares of common stock at an average price of approximately $9.84 per share under its ATM Program. As a result, the ATM Program was completed and terminated effective October 1, 2024, with all amounts available to be sold under the program.

247.    Likewise, on October 16, 2024, Capricor entered into an underwriting agreement with Piper Sandler and Oppenheimer as representatives of the underwriters (the "Underwriters"), pursuant to which the Company agreed to sell and issue, in a public offering, an aggregate of 5,073,800 shares of common stock, including the exercise in full of the underwriters' option to purchase additional shares to cover over allotments (the "October 2024 Offering"), at an offering price of $17.00 per share for total gross proceeds of approximately $86.3 million. The October 2024 Offering closed on October 18, 2024, resulting in approximately $80.8 million in net proceeds for the Company.

248.    In addition, on September 16, 2024, the Company entered into a Subscription Agreement with Nippon pursuant to which Capricor agreed to issue and sell to Nippon in a private placement, an aggregate of 2,798,507 shares of the common stock of the Company at a price per share of $5.36, which was issued at a 20% premium to the 60-day volume-weighted average price, for an aggregate purchase price of $15.0 million. The Subscription Agreement did include a six-month lock-up provision restricting Nippon from selling or otherwise disposing of shares of the Company's common stock, which ended on March 15, 2025.

249.    At no point during its October 2024 Offering or equity financings through its ATM Program did Capricor disclose that the FDA was not in agreement with its approach to submitting the BLA without HOPE-3 data or that its San Diego facility was plagued by cGMP deficiencies.

250.    Due to the Company's October 2024 Offering and shares sold through its ATM Program, Capricor raised enough cash to sustain operations that it

otherwise would not have been able to sustain. When reporting its financial results for the third quarter of 2024, on November 13, 2024, the Company provided an update on its financial outlook stating:

> The Company believes that based on the current operating plan and financial resources, our available cash, cash equivalents and marketable securities will be sufficient to cover anticipated expenses and capital requirements into 2027. This expectation excludes any additional potential milestone payments under the Commercialization and Distribution Agreements with Nippon [], as well as any strategic use of capital not currently in the Company's base-case planning assumptions.

251.    As of December 31, 2024, Capricor's total cash, cash equivalents, and marketable securities were approximately $151.5 million, compared to $39.5 million as of December 31, 2023. The Company reported that its increase in cash, cash equivalents and marketable securities from December 31, 2024 as compared to December 31, 2023 was primarily due to the October 2024 Offering, equity financings through its ATM Program and the private placement with Nippon, which was partially offset by its net loss of ~$40.5 million.

252.    Capricor's completed submission of the BLA in December 2024 also triggered another milestone payment of $10.0 million from Nippon, paid out in the first quarter of 2025.

### N.    Defendants' Fraud is Revealed to the Public

253.    Investors remained completely in the dark regarding the completeness and strength of Capricor's BLA submission until June 20, 2025, when the truth began to leak out. The week prior, on June 11, 2025, Capricor had announced that the previously noticed advisory committee meeting had been tentatively scheduled for July 30, pending confirmation by the FDA. But instead, on June 20, 2025, *Stat News* issued an article revealing that the event had been removed by the FDA. Specifically, the *Stat News* article reported from an unnamed source familiar with the regulatory review of Capricor's BLA for Deramiocel for the treatment of DMD-

cardiomyopathy that Vinay Prasad, the director of the FDA's Center for Biologics Evaluation and Research (CBER), was "skeptical of the treatment" and therefore decided to cancel the meeting reasoning it "would no longer be necessary."

254. Notwithstanding, the market continued to be misled by Defendants' misrepresentations and reiterated assurances regarding the strength of the BLA submitted. For example, following the *Stat News* article, analysts covering Capricor continued to highlight Defendants' earlier claims that no significant issues or major deficiencies were noted at the FDA's mid-cycle review of the BLA and that the late-stage meeting, planned for July, remained on the calendar. Analysts also focused on the Company's June 20, 2025 announcement of the updated 4-year results from HOPE-2 OLE as further support of CAP-1002's long-term safety and therapeutic durability.

255. Then, on July 9, 2025, the truth was fully revealed when Capricor announced its receipt of a CRL from the FDA regarding its BLA for deramiocel for the treatment of DMD-associated cardiomyopathy. Specifically, Capricor revealed, in pertinent part, that:

> In the CRL, the FDA stated that it had completed its review of the application but is unable to approve the BLA in its current form, specifically citing that the BLA does not meet the statutory requirement for substantial evidence of effectiveness and the need for additional clinical data. The CRL also referenced certain outstanding items in the Chemistry, Manufacturing, and Controls (CMC) section of the application, most of which Capricor believes it has addressed in prior communications to the FDA. However, these materials were not reviewed by the FDA due to the timing of the CRL issuance. The FDA confirmed that it will restart the review clock upon resubmission.

256. During a Special Call held the same day with investors, Defendant Marbán revealed that "[i]n terms of the open-label extension, their concern is that there was not a concurrent control group. We use the natural history group funded by the FDA."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

257.   As detailed above, FDA guidance clearly instructs that for natural history evidence to qualify as confirmatory evidence to substantiate one adequate and well-controlled clinical investigation to demonstrate substantial evidence of effectiveness, it must be distinct from any data used as a control.

258.   During this same Special Call, Defendant Marbán discussed the CRL with analysts speculating, in pertinent part, that FDA "could not include HOPE-3 opportunity in the CRL because it was not part of this initial application" but declared that Defendants "[a]re going to work closely with the agency to build HOPE-3 to be exactly what we need to get this BLA across the line."

259.   When later asked for clarity regarding the observations made concerning the statistical analyses applied to HOPE-2 trial data, Defendant Marbán responded, in relevant part, by saying "[s]o obviously, FDA had raised concerns about the initial analysis of the HOPE-2 clinical data. That conversation has been back and forth with the agency literally for years."

## O.    Post-Class Period Events Confirm the Fraud

260.   On August 11, 2025, during an investor conference call to discuss the financial results for the second quarter 2025, Defendant Marbán confirmed that the CMC deficiencies identified in the CRL stemmed from remaining unresolved Form 483 observations declaring, "[w]ith regard to the CMC and pre-commercial aspects of our program, I am pleased to announce that the FDA has now formally accepted all 483 items from our Pre-License Inspection. This milestone further validates the strength of our quality systems, manufacturing capabilities and overall commercial readiness. In addition, the CMC-related items noted in the CRL have either been addressed prior to the issuance of the CRL or have been internally addressed since."

261.   Later she explained that, even after the CRL, Capricor continued to provide responses to the FDA investigators who issued the Form 483, and only then had the Company's responses been deemed complete, clearing its path for

approval of its CMC section. "As I mentioned in the CRL, there were several CRL issues related to CMC. Many of those had already been addressed in information request responses that we provided prior to the issuance of the CRL, but they had stopped reviewing in anticipation of issuing the CRL. The rest of them have already been addressed, and we look forward to providing those in our response to the CRL."

262.  On September 4, 2025, the FDA announced plans to begin releasing CRLs "promptly" after it issues them to sponsors, rather than waiting until after approval as was its previous practice. Additionally, the FDA released a batch of CRLs for currently pending or withdrawn NDAs and BLAs, including the CRL received by Capricor.

263.  Capricor's CRL cited the following deficiencies relating to the "clinical and biostatistics" data submitted in the application:

> ***Your application provides data from the HOPE-2 and HOPE-2-OLE studies as the proposed primary and supportive evidence of effectiveness, respectively, for your product, deramiocel***. The HOPE-2 study failed to demonstrate efficacy for its prespecified primary efficacy endpoint, which was change from baseline to Month 12 in the mid-level (elbow) dimension of the Performance of Upper Limb version 1.2 (PUL 1.2), a neuromuscular outcome assessment. Additionally, HOPE-2 failed to demonstrate efficacy on its prespecified secondary endpoints. To support your proposed indication for treatment of cardiomyopathy in patients with Duchenne muscular dystrophy (DMD), you have presented post hoc analyses of HOPE-2 and HOPE-2-OLE. However, as outlined below, these post hoc analyses are not sufficient to provide substantial evidence of effectiveness to support approval of deramiocel.
>
> As stated in your response to an FDA information request . . . , the HOPE-2 study was intended to evaluate the effectiveness of deramiocel on neuromuscular function and was not designed to assess effectiveness for the treatment of cardiomyopathy in patients with DMD. Thus, ***HOPE-2 was not an adequate and well-controlled study with a clear statement of the objectives of the investigation and without sufficient prespecified collection of essential baseline clinical data to assess***

*effectiveness for the treatment of cardiomyopathy in patients with DMD*.

*The data submitted in this BLA to support the proposed indication include 50 secondary and exploratory endpoints, including post hoc analyses of 26 endpoints of cardiac MRI assessments*. These 50 secondary and exploratory endpoints were not prespecified for hypothesis testing, and no prespecified multiplicity adjustment strategy was employed for control of the overall Type 1 error rate. As such, *these analyses are exploratory and hypothesis generating only and cannot provide evidence of effectiveness*. No overall consistency in treatment effect was evident across a large number of exploratory cardiac endpoints in the primary HOPE-2 study, suggesting that the few nominally significant findings could be spurious. *Similarly, the post hoc and exploratory analyses of cardiac function from the nonrandomized HOPE-2-OLE study are subject to potential unmeasured confounding and inflation of Type 1 error*.

The Federal Food, Drug, and Cosmetic Act (FD&C Act), Section 505(d), 21 Code of Federal Regulations (CFR) § 314.126, and Section 351 of the Public Health Service Act (PHS Act) require substantial evidence of effectiveness from adequate and well-controlled studies to support a marketing application of a drug or biological product. *Your BLA does not meet the statutory requirement for substantial evidence of effectiveness. If you wish to seek approval of deramiocel for treatment of cardiomyopathy in patients with DMD, we recommend that you conduct adequate and well-controlled study(ies), whose primary objective is evaluation of cardiac outcomes in deramiocel-treated patients with DMD cardiomyopathy, compared to a randomized, concurrent control group over an appropriate duration of follow up*.

264. During the Company's investor conference call to discuss the financial results of the third quarter 2025, held on November 10, 2025, Defendant Marbán revealed that the FDA had classified the resubmission of its BLA, following the CRL, as a Class 2 resubmission, substantiating the severity of the deficiencies identified in the CRL. Indeed, as noted above, a Class 2 resubmission encompasses amendments requiring a reinspection of its facilities.

# V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS[18]

265.    As identified herein, Defendants issued a series of materially false and misleading statements causing Capricor's stock price to be artificially inflated throughout the Class Period. When the truth was revealed, this artificial inflation dissipated and Capricor's stock price declined, causing significant damages to Plaintiffs and other Class members.

*September 24, 2024*

266.    On September 24, 2024, Capricor issued a press release, attached as Exhibit 99.1 to a Current Report filed on a Form 8-K with the SEC that same day, signed by Defendant Marbán.

267.    In pertinent part, Capricor's September 24 press release announced, "***following recent meetings with the [FDA], its intent to file a [BLA] based on existing cardiac and natural history data for deramiocel to treat all patients diagnosed with [DMD] cardiomyopathy***." This announcement was followed by the below bulleted list:

***Following the FDA meetings*:**
- Capricor plans to commence the filing of a BLA in October of 2024 seeking full approval of deramiocel for the treatment of DMD-cardiomyopathy with full submission expected by year-end 2024.

- ***The BLA filing will be based on existing cardiac data from the Phase 2 HOPE-2 and HOPE-2 Open Label Extension (OLE) trials compared to natural history data*** provided by Vanderbilt University Medical Center and Cincinnati Children's Hospital Medical Center.

- ***In order to support potential label expansion to treat DMD skeletal muscle myopathy, Capricor plans to combine Cohorts***

---

[18] Where larger quotations were necessary to provide context and meaning to the alleged misstatements, Plaintiffs have bolded and italicized in the materially false and misleading portions of the statements identified.

*A and B of the Phase 3 HOPE-3 clinical trial to serve as a post-approval study* and does not intend to unblind Cohort A at this time, which was expected to occur in the fourth quarter of 2024.

268.   The foregoing statements identified in ¶267 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendants' representations, Capricor's "intent to file a [BLA] [seeking full approval] based on existing cardiac and natural history data for deramiocel to treat all patients diagnosed with [DMD] cardiomyopathy" was not aligned with FDA views and in "recent meetings with the [FDA]," agency staff again repeated explicit instruction that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to significant risk of rejection by the FDA, a materialized risk that was concealed from investors, and created a materially false and/or misleading impression about the strength of existing cardiac data as compared to and substantiated by natural history data.

269.   Defendant Marbán is quoted in the September 24 release as saying: There are currently no approved therapies for DMD cardiomyopathy, which is the leading cause of death in those with Duchenne. *Based on the strength of our cardiac data, combined with the FDA's commitment to advancing therapeutics for the treatment of rare diseases, we are seeking approval for the cardiomyopathy associated with DMD* and will look to expand the label for skeletal muscle myopathy post-approval … *This approach is the result of multiple in-depth meetings with FDA where we showed robust and positive cardiac data from our HOPE-2 and HOPE-2 OLE studies compared to natural history data from a large cohort of patients*.

Deramiocel has shown in multiple clinical trials attenuation of the cardiac implications of DMD. *Based on the totality of evidence of the safety and efficacy data deramiocel has shown, we believe this is the*

*best path forward to potential approval, allowing us to bring this novel, first-in-class treatment to patients in need in the most expeditious manner.* …

270.    The foregoing statements identified in ¶269 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendant Marbán's representation that "[t]his approach is the result of multiple in-depth meetings with FDA," Capricor's submission of a BLA seeking full approval of CAP-1002 for the treatment of DMD-associated cardiomyopathy based on "cardiac data from [Capricor's] HOPE-2 and HOPE-2 OLE studies compared to natural history data from a large cohort of patients" was, in fact, not aligned with FDA views. In numerous meetings with the FDA, agency staff again repeated explicit instruction that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to significant risk of rejection by the FDA, a materialized risk that was concealed from investors, and created a materially false and/or misleading impression about the strength of Capricor's existing cardiac data as compared to and substantiated by natural history data.

271.    Further, Defendant Marbán's professed belief that this was "the best path forward to potential approval" was materially false and misleading when made because the supporting facts supplied were untrue. The FDA had already communicated to Defendants that "[b]ased on the totality of evidence of the safety and efficacy data deramiocel has shown," it, in fact, lacked substantial evidence of effectiveness necessary to support a BLA.

272.    Relatedly, the above statement concerning the "best path forward to potential approval, allowing [Capricor] to bring this novel, first-in-class treatment

to patients in need in the most expeditious manner" was materially false and misleading when made because it contradicted and concealed the severe risk of substantial delay caused by the BLA's lack of substantial evidence of effectiveness. Once agency staff began its substantive review of the BLA without the repeatedly requested HOPE-3 data, the decision to withhold such data severely increased the risk of a CRL finding that the BLA was not approvable in its current form. This, in turn, would require submission of additional clinical data and starting the review process anew.

273. That same day, Capricor hosted a Special Call with investors to discuss this regulatory update. Defendant Marbán opened the call by declaring, "it's an amazing day for the patients with DMD as well as for those of us at Capricor because we are proud to announce that *after working diligently with FDA through the course of 2024, we have decided to derisk our path forward by moving for full approval to treat Duchenne cardiomyopathy with deramiocel*."

274. The foregoing statements identified in ¶273 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendant Marbán's description of Capricor's decision to submit a BLA seeking full approval of CAP-1002 for the treatment of DMD-associated cardiomyopathy based on existing cardiac data and natural history data, resulting from "working diligently with FDA through the course of 2024," this approach was, in fact, not aligned with FDA views. In numerous meetings with the FDA, agency staff provided repeated and explicit instruction to Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. As a result, this approach did not "derisk" the Company's

path forward to approval, but rather, subjected it to an ***increased risk*** of rejection by the FDA, which the Company concealed from investors until it materialized.

275. During the Question-and-Answer portion of the call, Defendant Marbán engaged with analysts providing, in pertinent part:

<Kristen Brianne Kluska Cantor Fitzgerald & Co., Research Division – Analyst> Appreciate that. And then based on the timelines you gave to us, it sounds like the approval decision is going to come before the HOPE-3 full data reads out next year. So has the FDA given any sense about what they would want to see from that full readout to ensure that this drug stays on the market in that confirmatory study?

And obviously, I understand that study's primary endpoint is on PUL 2.0 to support the label expansion. But will there also be an increased emphasis on the cardiac endpoints given that's what's supporting the approval process today?

<Linda Marbán Capricor Therapeutics, Inc. – Co-Founder, President, CEO & Director> Thanks, Kristen. Thanks for giving me the chance to highlight that ***the application that's going in at the end of this year is for full approval. That means the confirmatory study is not necessary.*** The label would be for the cardiomyopathy and it would be relatively impermeable.

****

***Obviously, we have secondary cardiac endpoints in there. But if, in fact, the label is for full approval, it would just become a nice to have, not A necessary to have.*** Having said that, and I want to highlight that pretty much everybody that will come under the expanded label for the skeletal muscle myopathy would be included in the cardiomyopathy label, especially our HOPE-3 guys. So the opportunity for label expansion may be to the younger patients or to those that are at other stages where they don't have the advanced heart disease. So we'll see sort of where it goes. Right now, we're working on this BLA and are incredibly enthusiastic about the opportunity.

276. The foregoing statements identified in ¶275 were materially false and misleading when made because they created a false impression about the strength of Capricor's existing cardiac data as compared to and reportedly substantiated by

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

external natural history data, and the sufficiency or completeness of its BLA submission seeking full approval without HOPE-3 data. In numerous formal and informal meetings and communications with the FDA about the product's regulatory approval pathway, the FDA explicitly told Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. Thus, HOPE-3 data was always necessary for full approval of CAP-1002 for any indication, and never just supplemental or "nice to have."

*October 9, 2024*

277.  On October 9, 2024, Capricor issued a press release, attached as Exhibit 99.1 to a Current Report filed on a Form 8-K with the SEC that same day, signed by Defendant Marbán, announcing it had "initiated its rolling submission process with the [FDA] for a [BLA] seeking full approval for deramiocel to treat all patients diagnosed with [DMD] cardiomyopathy." In pertinent part, the press release quoted Defendant Marbán as saying:

> ***This announcement marks an important step in the U.S. regulatory process towards a potential Biologics License Application approval of deramiocel for the treatment of DMD. … An approval of deramiocel would allow us to expedite the delivery of this novel, first-in-class treatment to patients in need.*** We look forward to working with the FDA during this process.

278.  The foregoing statements identified in ¶277 were materially false and misleading when made because it contradicted and concealed the severe risk of substantial delay caused by the BLA's, based solely on existing cardiac data and natural history data, lack of substantial evidence of effectiveness. Prior to the Company's initiation of its rolling submission, the FDA explicitly told Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. Once agency staff began its substantive review of the BLA without the repeatedly requested HOPE-3

data, the decision to withhold such data severely increased the risk of a CRL finding that the BLA was not approvable in its current form. This, in turn, would require submission of additional clinical data and starting the review process anew.

*October 11, 2024*

279.  On October 11, 2024, Capricor issued a press release announcing positive 3-year safety and efficacy results from its ongoing HOPE-2 OLE study. In pertinent part, Defendant Marbán is quoted as saying:

> These results are extremely impactful for patients living with DMD as they showed sustained cardiac and skeletal muscle benefits after 3 years of continuous treatment with deramiocel, which underscores the potential long-term efficacy this therapy can offer. ***As we previously announced, this dataset will be one of the key elements of our BLA submission to the [FDA], for approval of deramiocel to treat patients with DMD cardiomyopathy… We have been working closely with FDA to move deramiocel towards potential approval as quickly as possible*** because once heart function is lost, it is unlikely to be restored. Furthermore, as more therapies become available that could impact the trajectory of skeletal muscle loss in DMD, preservation of cardiac function will be even more important. We expect deramiocel to be a lifelong treatment, with an infusion delivered quarterly, with major potential to be widely adopted across the DMD-cardiomyopathy treatment landscape.

280.  The foregoing statements identified in ¶279 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not.  The statements omitted that the Company's submission of a BLA seeking full approval of CAP-1002 for the treatment of DMD-associated cardiomyopathy based solely on cardiac data from the HOPE-2 trial and HOPE-2 OLE study compared to natural history data was not aligned with FDA views, and in numerous meetings with the FDA about the product's regulatory approval pathway, the FDA explicitly told Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should

be supported with pivotal Phase III HOPE-3 clinical data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to an increased risk of rejection by the FDA, a risk that was concealed from investors until it materialized, and created a materially false and/or misleading impression about the strength of existing cardiac data as compared to and substantiated by natural history data.

281.    Relatedly, the above statement concerning "working closely with FDA to move deramiocel towards potential approval as quickly as possible" was materially false and misleading when made because it omitted mention of the many ways in which the Company was intentionally deviating from FDA advice and concealed the delay that such deviations made likely. Once agency staff began its substantive review of the BLA without the repeatedly requested HOPE-3 data, the decision to withhold such data severely increased the risk of a CRL finding that the BLA was not approvable in its current form. This, in turn, would require submission of additional clinical data and starting the review process anew.

*October 16, 2024*

282.    On October 16, 2024, Capricor issued a Current Report filed on a Form 8-K with the SEC, signed by Defendant Marbán. The October 16 report outlined the Company's "Recent Developments" providing, in pertinent part:

> ***Following recent meetings with the [FDA], Capricor [ ] announced its intent to file a [BLA] based on existing cardiac and natural history data for deramiocel*** to treat all patients diagnosed with Duchenne muscular dystrophy ('DMD') cardiomyopathy.
>
> - Capricor commenced the filing of a BLA in October of 2024 seeking full approval of deramiocel for the treatment of DMD-cardiomyopathy with full submission expected by year-end 2024.
>
> - The BLA filing will be based on existing cardiac data from the Phase 2 HOPE-2 and HOPE-2 Open Label Extension ('OLE') trials compared to natural history data provided by Vanderbilt

University Medical Center and Cincinnati Children's Hospital Medical Center.

- In order to support potential label expansion to treat DMD skeletal muscle myopathy, Capricor plans to combine Cohorts A and B of the Phase 3 HOPE-3 clinical trial to serve as a post-approval study and does not intend to unblind Cohort A at this time, which was expected to occur in the fourth quarter of 2024.

283. The foregoing statements identified in ¶282 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Defendants' representations omitted that Capricor's "intent to file a [BLA] [seeking full approval] based on existing cardiac and natural history data for deramiocel to treat all patients diagnosed with [DMD] cardiomyopathy" was not aligned with FDA views and in "recent meetings with the [FDA]," agency staff explicitly told Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to an increased risk of rejection by the FDA, a materialized risk that was concealed from investors, and created a materially false and/or misleading impression about the strength of Capricor's existing cardiac data as compared to and reportedly substantiated by natural history data.

*November 13, 2024*

284. On November 13, 2024, Capricor issued a press release, attached as Exhibit 99.1 to a Current Report filed on Form 8-K with the SEC that same day, signed by Defendant Marbán, announcing its third quarter 2024 financial results and provided an update as to recent developments and upcoming milestones. When addressing the DMD program, the press release provided, in pertinent part:

- ***Based on FDA feedback and following Capricor's recent pre-BLA meeting in August, Capricor initiated the rolling BLA submission in October of 2024 seeking full approval of deramiocel for the treatment of DMD-cardiomyopathy with full submission expected to be complete by year end 2024.***

- ***The BLA submission will be based on existing cardiac data from the Phase 2 HOPE-2 and HOPE-2 open label extension (OLE) trials compared to patient-level natural history data.***

285.    The foregoing statements identified in ¶284 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendants' representations, Capricor's "rolling BLA submission … seeking full approval of deramiocel for the treatment of DMD-cardiomyopathy … based on existing cardiac data from the Phase 2 HOPE-2 and HOPE-2 open label extension (OLE) trials compared to patient-level natural history data" was not aligned with FDA views and was not "[b]ased on FDA feedback and following Capricor's recent pre-BLA meeting."  In fact, agency staff explicitly told Defendants to submit pivotal Phase III Hope-3 data for their BLA for CAP-1002 for the treatment of DMD or any related indication. Defendants' decision to nonetheless seek full approval without HOPE-3 data created an increased risk of rejection by the FDA that was concealed from investors until it materialized and created a materially false and/or misleading impression about the strength of existing cardiac data as compared to and substantiated by natural history data.

286.    That same day, Capricor hosted an investor conference call to discuss the financial results for the third quarter of 2024. During the call, Defendant Marbán discussed the significant benefits of CAP-1002 after conducting multiple clinical trials, stating, in pertinent part:

As you know, we have been working to develop deramiocel, formerly known as CAP-1002, for the treatment of DMD for the last 8 years. We

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

have shown in multiple clinical trials the salutary benefits of deramiocel in attenuating the consequences of the skeletal muscle myopathy and improving the cardiomyopathy associated with this devastating disease. *We have consistently presented the data as it has become available to the FDA, and the data has shown clinically meaningful as well as statistically significant improvements. Based on the strength of the data as well as the large unmet medical need of the cardiac implications, we have decided after conferring with the FDA to file a BLA for full approval for the cardiomyopathy associated with DMD*.

\* \* \*

*It is a clear strategy, which gives Capricor the opportunity to achieve potential approval for a first-in-class treatment for one of the most devastating consequences of DMD.* I am pleased to report that the first module of the BLA was submitted, and we are on track to fully submit our BLA package by year-end 2024. I want to thank my team for their extraordinary efforts to this point and reiterate that we are focusing all of our efforts on this endeavor. This includes preparations for CMC inspection, pre-commercial activities and market access work with our distribution partner, NS Pharma. While we believe that an AdCom may not be necessary, we are preparing internally for that eventuality.

287.   The foregoing statements identified in ¶286 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendant Marbán's representation that "[b]ased on the strength of the data … we have decided after conferring with the FDA to file a BLA for full approval for the cardiomyopathy associated with DMD," Capricor's submission based on exclusively on cardiac data from HOPE-2 and HOPE-2 OLE studies compared to natural history data was, in fact, not aligned with FDA views. In numerous meetings with the FDA, agency staff explicitly instructed Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. As a result, this approach was not "a clear strategy" to achieving marketing approval, but rather, subjected

the BLA submission, seeking full approval without HOPE-3 data, to an increased risk of rejection by the FDA, a materialized risk that was concealed from investors, and created a materially false and/or misleading impression about the strength of existing cardiac data as compared to and substantiated by natural history data.

288.   During a Question-and-Answer portion of the same earnings call, Defendant Marbán elaborated on the regulatory filing and Capricor's commercial scale manufacturing stating, in pertinent part:

> <Q: Edward Andrew Tenthoff – Piper Sandler – Analyst> Obviously, there's a lot to do behind the scenes here with the filings and with the regulatory approval that you're seeking with the FDA. What are you and Nippon [] doing to prepare this market and to get ready for launch?

> <A: Defendant Marbán> …In terms of your second question with manufacturing, we have been preparing for this day for a long time. So we started thinking about the commercialization of deramiocel, let's call it, a decade ago when we entered into the clinic. And so we knew what we had to do. The good thing is -- that we have done is we have kept manufacturing in-house all this time. ***So it's a derisked manufacturing procedure because nobody knows it better than we have. When we built the San Diego manufacturing facility, it's small, but it's commercial scale. So we know exactly how to do it. We've been preparing for PLI really for about 2 years since we designed and opened that facility. So that one is ready to go.*** We have high confidence that we should be able to pass inspection. And now because we are anticipating great adoption of deramiocel by Duchenne patients, we're also planning and executing a build-out of a new manufacturing facility.

289.   The foregoing statements identified in ¶288 were materially false and misleading when made because they created a false impression about the strengthen of CMC data submitted in support of the BLA, the readiness of Capricor's commercial scale manufacturing facility upon product approval and its compliance with applicable cGMP standards. Contrary to Defendant Marbán's representations, the San Diego facility was, in fact, not "ready to go," and as detailed by CW1 and CW2, at the time of the BLA submission, there was widespread concern at the

Company that the application would be rejected because of the rampant and unresolved CMC deficiencies. Such problems spanned from a contamination-prone facility layout to weak data controls to a deficient and incomplete quality control system. For example, when CW2 began working at Capricor in November 2024, it still had never built out the audit tools needed to track cGMP compliance. And when CW1 left Capricor in August 2024, it still had not done testing needed to define the tolerances for the equipment used to produce CAP-1002 at the San Diego facility, and therefore the Company did not know the true failure rate for the manufacture of CAP-1002. Accordingly, without product-specific testing, CW1 stated that Capricor could not know how CAP-1002 should be stored or handled. As a result, Capricor's manufacturing procedure had not been "derisked," and the San Diego facility was not properly prepared for the PLI, but rather, was at an increased risk of a failed inspection. This, in turn, subjected the BLA submission to an increased risk of rejection by the FDA due to CMC deficiencies, a risk that was concealed from investors until after it materialized.

*March 19, 2025*

290.  On March 19, 2025, Capricor issued a press release, attached as Exhibit 99.1 to a Current Report filed on a Form 8-K with the SEC that same day, signed by Defendant Marbán, reporting its fourth quarter and full year 2024 financial results and provided an update as to its BLA. In pertinent part, the March 19 press release stated:

> ***In March 2025, the FDA accepted Capricor's BLA seeking full approval of deramiocel for the treatment of individuals with Duchenne muscular dystrophy cardiomyopathy***. … The BLA submission for deramiocel ***included safety and efficacy data from Capricor's Phase 2 HOPE-2 placebo-controlled trial and the HOPE-2 open label extension (OLE) trial compared to natural history data from an FDA-funded and published dataset on the implications of DMD cardiomyopathy and potential biomarkers of disease progression***. The results from these clinical studies demonstrated statistically significant and clinically relevant improvements in cardiac

function up to three-years after treatment as well as a consistent safety profile. ***Capricor's ongoing HOPE-3 Phase 3 study which is assessing skeletal muscle function has not been requested for review by the FDA for this application.***

291.    The foregoing statements identified in ¶290 were materially false and misleading when made because the FDA had, in fact, repeatedly requested that the pivotal Phase III HOPE-3 data be submitted for review as part of any BLA for CAP-1002 for the treatment of DMD or any related indication . As a result, the statements created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not, and materially misled the public about the strength of existing cardiac data as compared to and substantiated by natural history data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to significant risk of rejection by the FDA due to a lack of substantial evidence of effectiveness, a risk that was concealed from investors until it materialized.

292.    The March 19 press release quoted Defendant Marbán reiterating Capricor's goal in bringing the first cellular therapy to market to treat patients with DMD-associated cardiomyopathy and stating, in relevant part:

> 2024 was a transformational year for Capricor and the patients we serve as we move closer to our goal of bringing the first cellular therapy to market for the treatment of Duchenne-cardiomyopathy, a condition for which there are no approved therapies. ***We continue to work diligently towards our August 31, 2025 action date for our deramiocel [BLA], directly engaging with the FDA, preparing for pre-approval licensure inspection and preparing for potential commercial launch with our partner Nippon [ ]. Our BLA is the culmination of a body of work that has been focused on bringing this transformational therapy to those patients in need with the potential to alter the trajectory of this degenerative disease***.

293.    That same day, Capricor hosted an investor conference call to discuss the financial results for the four quarter and fiscal year 2024. During the call, Defendant Marbán reiterated the strengthen of Capricor's BLA submission, emphasizing supporting efficacy data stating, in pertinent part:

> *As we look ahead to our PDUFA date, set for August 31, 2025, we are working with the FDA as they are actively reviewing our application*. At this time, the FDA has not indicated to us whether an AdCom will be necessary, but we are preparing for one should that be needed. And I'm pleased to inform you that we have officially scheduled our PLI, or pre-licensing inspection, of our manufacturing facility, which is set for the second quarter of this year.
>
> Our BLA is supported with data from 2 trials: our Phase II HOPE-2 placebo control trial and our HOPE-2 open-label extension trial compared to patient-level natural history data from the DMD Cardiac Consortium led by Dr. Jonathan Soslow at Vanderbilt University. Many factors have given us confidence in our BLA submission pathway.
>
> First and foremost, it has a strong safety profile and has been administered to over 250 human subjects across several clinical trials over multiple years. *Equally as important is that the data continues to show clinical and statistically significant efficacy in the treatment of DMD cardiomyopathy. This data is foundational to our BLA filing.*

294.    The foregoing statements identified in ¶¶292-93 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendant Marbán's representations, the BLA submitted was not aligned with FDA views, and on numerous occasions, agency staff repeatedly instructed Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to significant risk of rejection by the FDA due to a lack of substantial evidence of effectiveness, a risk that was concealed from investors until it materialized. Further,

87

the statements created a materially false and/or misleading impression about the strength of existing cardiac data as compared to and substantiated by natural history data to support BLA approval.

295. Relatedly, the above statements concerning Defendants continued diligent work towards the "August 31, 2025 action date for our deramiocel [BLA]" were materially false and misleading when made because they contradicted and concealed the severe risk of substantial delay caused Defendants' decision to submit a BLA that lacked statutorily required substantial evidence of effectiveness. Once agency staff began its substantive review of the BLA without the repeatedly requested HOPE-3 data, the decision to withhold such data severely increased the risk of a CRL finding that the BLA was not approvable in its current form. This, in turn, would require submission of additional clinical data and starting the review process anew.

296. In addition, the above-identified statements were materially false and misleading when made because they created a false impression about the strength of CMC data submitted in support of the BLA, the readiness of Capricor's commercial scale manufacturing facility upon product approval, and its compliance with applicable cGMP standards. As detailed by CW1 and CW2, at the time of the BLA submission, there was widespread concern within the Company that the application would be rejected because of the rampant and unresolved CMC deficiencies. Such problems spanned from a contamination-prone facility layout to weak data controls to a deficient and incomplete quality control system. As a result, the San Diego facility was not properly prepared for the PLI, but rather, was at an increased risk of a failed inspection. This, in turn, subjected the BLA submission to an increased risk of rejection by the FDA due to CMC deficiencies, a risk that was concealed from investors until after it materialized.

297.    During a Question-and-Answer portion of the same earnings call, Defendant Marbán commented on whether there will be an advisory committee with the FDA and possible discussion about HOPE-3 stating, in pertinent part:

<Q: Joseph Pantginis – H.C. Wainwright & Co. – Analyst> And then I guess second question is, obviously, you have no indication that there's going to be an AdCom right now. When do you think you might hear an answer? And for example, if there were an AdCom, would that be a place that they might want to not necessarily require but maybe force a discussion regarding HOPE-3?

<A: Defendant Marbán > Yes. So we're waiting every day to hear from them on whether they would want an AdCom. They will need some time to put it together. And even though we're actively prepping for one as we speak, they have to give us time to prepare as well. So we expect to hear soon.

I think part of the delay is just based on some of the turmoil that's going on in the government right now. And so I expect that things are moving at a different pace than they might have even just a few months ago. So stay tuned. When we know, we will let everybody else know. We see an AdCom neither as a benefit nor a risk. We believe very strongly in our application. ***We have clinically and statistically significant data. The data stands on its own.*** However, if we need to get up there and talk about it, we will absolutely do that.

***In terms of HOPE-3, what they have told us is that they are not considering HOPE-3 for this biologics license application*** that they understand that the primary efficacy endpoint of HOPE-3 is skeletal muscle that, that would be used for post-approval label expansion. We plan on taking HOPE-3 potentially outside the U.S. to order to expand our global footprint.

***And the focus of this application as we and they understand it is the data that we've talked about, which is the HOPE-2 data, the HOPE-2 open-label extension data compared to the natural history data set from the Cardiac Consortium.*** And so I don't anticipate a discussion of HOPE-3 at an AdCom, but if it comes up, we'll be ready to take those questions as well.

298.   The foregoing statements identified in ¶297 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendants Marbán's representations, the HOPE-2 clinical data and HOPE-2 OLE study compared to natural history data did not, in fact, "stand[] on its own." The FDA expressly communicated to Defendants that HOPE-2 did not qualify as an adequate and well-controlled clinical investigation. As a result, on numerous occasions, agency staff repeatedly instructed Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to a significant risk of rejection by the FDA due to a lack of substantial evidence of effectiveness, a risk that was concealed from investors until it materialized.

299.   Further, the statement that the agency "told us … that they are not considering HOPE-3 for this biologics license application" but would consider such data for label expansion was likewise materially false and misleading when made. The FDA, in fact, told Capricor it wanted to see HOPE-3 data but instead of heeding the agency's guidance, Capricor opted to file a BLA seeking full approval based on existing efficacy data, completing the submission before its release of HOPE 3 data. As a result, the FDA did not have the option to consider the pivotal Phase III HOPE 3 data for this BLA as it was not submitted for substantive review.

*May 5, 2025*

300.   On May 5, 2025, Capricor issued a press release announcing the completion of its mid-cycle review meeting with the FDA on its BLA. In pertinent part, the May 5 press release stated that, "***[d]uring the meeting, FDA stated that***

*no significant deficiencies have been identified by the Review Committee and that the package is on track for a [PDUFA] action date of August 31, 2025*."

301.    The foregoing statements identified in ¶300 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Capricor later admitted to receiving *50* information requests (IR) from the FDA during the roughly 4-month long review period.

302.    Relatedly, the above statement that "the package is on track for a [PDUFA] action date of August 31, 2025" was materially false and misleading when made because it contradicted and concealed the severe risk of substantial delay caused by Defendants' decision to submit a BLA without the legally required substantial evidence of effectiveness. Once agency staff began its substantive review of the BLA without expressly requested HOPE-3 data, this increased the risk that Capricor would be issued a CRL determining that the BLA was not approvable in its current form. This, in turn, would require submission of additional clinical data and starting the review process anew.

*May 13, 2025*

303.    On May 13, 2025, Capricor issued a press release, attached as Exhibit 99.1 to a Current Report filed on a Form 8-K with the SEC that same day, signed by Defendant Marbán, announcing its first quarter 2025 financial results and providing an update on recent developments. When discussing the DMD program, the May 13 press release provided, in pertinent part:

> In March 2025, the FDA accepted for review Capricor's BLA seeking full approval of deramiocel for the treatment of individuals with DMD-cardiomyopathy. The application was granted priority review, with a PDUFA action date set for August 31, 2025. *In May 2025, we completed a mid-cycle review meeting with the FDA, during which no significant deficiencies were identified by the review committee.* The FDA also confirmed its intent to convene an advisory committee

meeting. The BLA is supported by data from Capricor's randomized double-blind and placebo-controlled Phase 2 HOPE-2 trial and the HOPE-2 open-label extension (OLE) trial, compared to an external comparator using propensity matched patient-level data from an FDA-funded and published dataset of DMD-cardiomyopathy and associated biomarkers of disease progression. Results from these studies demonstrated statistically significant and clinically meaningful improvements in cardiac function for up to three years post-treatment, along with a consistent safety profile. ***Notably, FDA has acknowledged that the ongoing HOPE-3 Phase 3 trial, which is assessing skeletal muscle function, is not a part of Capricor's BLA for full approval of deramiocel.***

304.    The foregoing statements identified in ¶303 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendants' representations, Capricor's BLA seeking full approval based on existing cardiac and natural history data for CAP-1002 was not aligned with FDA views. Prior to BLA submission, the FDA expressly communicated to Defendants that HOPE-2 did not qualify as an adequate and well-controlled clinical investigation. As a result, on numerous occasions, agency staff repeatedly instructed Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-3 clinical data. This, in turn, subjected the BLA submission, seeking full approval without HOPE-3 data, to significant risk of rejection by the FDA due to a lack of substantial evidence of effectiveness, a risk that was concealed from investors until it materialized. Relatedly, the above identified statements created a materially false and/or misleading impression about the strength of existing cardiac data as compared to and substantiated by natural history data in support of BLA approval. Indeed, Capricor later admitted to receiving *50* information requests (IR) from the FDA during the roughly 4-month long review period.

305. Further, the statement that the "FDA has acknowledged that the ongoing HOPE-3 Phase 3 trial, which is assessing skeletal muscle function, is not a part of Capricor's BLA for full approval of deramiocel" was likewise materially false and misleading when made. The FDA, in fact, told Capricor it wanted to see HOPE-3 data but instead of heeding the agency's guidance, Capricor opted to file a BLA seeking full approval based on existing efficacy data, completing the submission before its release of HOPE 3 data. As a result, the FDA did not have the option to consider the pivotal Phase III HOPE 3 data for this BLA as it was not submitted for substantive review.

306. The May 13 press release quoted Defendant Marbán as saying, in pertinent part:

> *We continue to make strong progress in 2025 as we advance toward our goal of delivering the first approved therapy for Duchenne cardiomyopathy*—a condition with no approved treatments[.] … *We continue to have active dialogue with the FDA as they review our BLA and we remain on track with our PDUFA target action date of August 31, 2025*. Preparations are progressing for our upcoming FDA advisory committee meeting, pre-approval inspection, and potential commercial launch.

307. The foregoing statements identified in ¶306 were materially false and misleading when made because they omitted that the active dialogue with the FDA confirmed to Defendants that the FDA advised Capricor that the HOPE-3 data should be submitted as part of the BLA, and created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendants' representations, Capricor's BLA seeking full approval based on existing cardiac and natural history data for CAP-1002 was not aligned with FDA views that had been expressed to Capricor.

308. Relatedly, the above statement that "we remain on track with our PDUFA target action date of August 31, 2025" was materially false and misleading

when made because it contradicted and concealed the severe risk of delay caused by Defendants' decision to submit a BLA without the legally required. Once agency staff began its substantive review of the BLA without expressly requested HOPE-3 data, this increased the risk that Capricor would be issued a CRL determining that the BLA was not approvable in its current form. This, in turn, would require submission of additional clinical data and starting the review process anew.

309.   During an investor conference call hosted by Capricor to discuss the first quarter 2025 financial results, held on May 13, 2025, Defendant Marbán assured investors that participating in an Advisory Committee meeting is a positive step for CAP-1002 and touted the data supporting its BLA stating, in pertinent part:

> *Our path with FDA to this point has been smooth, and FDA has not fallen behind in any way. Our objectives, deliverables and timelines remain on track*. There has also been concern expressed over the announcement of an FDA advisory committee meeting for Capricor.
>
> I want to highlight that having the opportunity to participate in an AdCom is a positive step for Capricor, for deramiocel and for the program as a whole because *it gives us the opportunity to showcase the strong scientific and clinical data that is the basis of our BLA*. We do not believe nor has FDA signaled that the determination to hold an AdCom has anything to do with weaknesses in the application, but rather, we believe the nature of a first-in-class therapy for a new indication warrants additional feedback from subject matter experts in the field as well as giving the advocacy and patient community an opportunity to voice their opinion on deramiocel.
>
> * * *
>
> I would now like to discuss the data that supports our BLA. The filing is based on our blinded, randomized and placebo-controlled HOPE-2 study and also by the HOPE-2 open-label extension study compared to a robust FDA and NHLBI-funded natural history data set. *While sample sizes are small, what is most relevant is not the size of the data set, but that the statistically and clinically significant differences are highly unlikely to be due to chance.* We have worked with multiple internal and external statisticians, presented the data at meetings and to

KOLs. And what we have heard, seen and acted upon was that the likelihood is extremely low that the impact on the heart or for that matter, the skeletal muscle is due to chance.

***We have 3 clinical trials and approximately 4 years of open-label extension data that supports that premise. There has also been an emphasis and written guidance from FDA encouraging the use of real-world evidence to support clinical trial data, especially in rare diseases. Deramiocel is a perfect case for using this type of data to validate the efficacy of a drug product.***

310.   The foregoing statements identified in ¶309 were materially false and misleading when made because the "path with FDA to this point" was anything but "smooth" because the Company had repeatedly rejected explicit FDA advice about pivotal clinical data for the BLA. Capricor later admitted to receiving **50** information requests (IR) from the FDA during the roughly 4-month long review period. Relatedly, the above statement that "[o]ur objectives, deliverables and timelines remain on track" was materially false and misleading when made because it contradicted and concealed the delay that was highly likely as a result of Defendants' decision to submit a BLA without the legally required substantial evidence of effectiveness. Once agency staff began its substantive review of the BLA without expressly requested HOPE-3 data, this increased the risk that Capricor would be issued a CRL determining that the BLA was not approvable in its current form. This, in turn, would require submission of additional clinical data and starting the review process anew.

311.   In addition, the identified statements created a materially false and/or misleading impression about the strength of existing clinical data that served as the basis for its BLA. Contrary to Defendants' representations, existing "scientific and clinical data" was not "strong" and did not align with FDA views for demonstrating substantial evidence of effectiveness. As such, on numerous occasions, agency staff repeatedly instructed Defendants that any BLA for CAP-1002 for the treatment of DMD or any related indication should be supported with pivotal Phase III HOPE-

95

3 clinical data. Defendants' BLA submission, seeking full approval without HOPE-3 data, therefore, was subject to a high risk of rejection by the FDA, a risk that was concealed from investors until it materialized.

*June 11, 2025*

312.   On June 11, 2025, Capricor issued a press release announcing "Key Regulatory Updates for its [DMD] Program" highlighting, in pertinent part:

> **[T]he successful completion of the [FDA]'s Pre-License Inspection (PLI) of its San Diego manufacturing facility for Deramiocel**, the Company's lead cell therapy candidate with a [BLA] under FDA review for potential approval in the treatment of [DMD]. The inspection concluded with a Form 483 containing several observations. **The Company has submitted its responses to the FDA, none of which required material changes to the cGMP process or facility. The observations were primarily related to routine quality systems and documentation practices.** The Company is confident that the facility will meet the necessary requirements to support product licensure and, pending approval, commercial launch.

313.   In relevant part, the June 11 press release quoted Defendant Marbán as saying, "**[t]his inspection outcome is a major regulatory milestone, particularly in a field where standards are exceptionally high … It reflects the strength of our manufacturing capabilities and positions us well as we advance toward potential approval**."

314.   That day, Oppenheimer issued a report following Capricor's announcement of the FDA's completed PLI and resulting Form 483. In pertinent part, Oppenheimer claimed it "spoke with management th[at] morning, who characterized the inspectional observations as '**minor, check-box**' type that will not require any material changes to process or facility. Written responses have already been submitted, and management does not expect these items to delay the review process."

315.   The foregoing statements identified in ¶¶312-14 were materially false and misleading when made because the PLI was not "successful" and because the

96

statements referring to the inspectional observations as "minor, check-box" type "primarily related to routine quality systems and documentation practices," created a false impression about the nature, severity and significance of the identified CMC deficiencies outlined in the Form 483. Contrary to Defendants' representations, a complete response to the Form 483 received by Capricor did require "material changes to the cGMP process or facility." This, in turn, subjected the BLA submission to an increased risk of rejection by the FDA due to CMC deficiencies, a risk that was concealed from investors until it materialized.

*June 17, 2025*

316. On June 17, 2025, Capricor issued a press release announcing, in pertinent part, "Regulatory Progress for Duchenne Muscular Dystrophy Program." Specifically, the June 17 press release highlighted, "***Capricor remains on track for the August 31, 2025, PDUFA date for Deramiocel in [DMD] following successful FDA Pre-License Inspection***."

317. Similarly, Defendant Marbán is quoted as saying, in pertinent part: ***Capricor successfully completed its Pre-License Inspection***, an important regulatory milestone for approval of its Biologics License Application (BLA) for DMD and we believe all review activities remain on track as we approach our PDUFA date. ***With key milestones aligning, we continue to prepare for the potential commercial launch of Deramiocel*** and the opportunity to deliver meaningful benefits to patients with Duchenne.

318. The foregoing statements identified in ¶¶316-17 were materially false and misleading when made because the PLI was not "successful" and because the statements referring to the inspectional observations as "minor, check-box" type "primarily related to routine quality systems and documentation practices," created a false impression about the nature, severity and significance of the identified CMC deficiencies outlined in the Form 483. Contrary to Defendants' representations, a complete response to the Form 483 received by Capricor did require "material

changes to the cGMP process or facility." This, in turn, subjected the BLA submission to an increased risk of rejection by the FDA due to CMC deficiencies, a risk that was concealed from investors until it materialized.

*June 20, 2025*

319.    On June 20, 2025, Capricor issued a press release announcing positive 4-year safety and efficacy data from its ongoing HOPE-2 OLE study. In pertinent part, Defendant Marbán is quoted as saying:

> These four-year data reinforce the strength and durability of Deramiocel's clinical benefit and favorable safety profile across both cardiac and skeletal muscle function[.] … ***With our BLA under priority review and several key regulatory steps now completed, we are executing with focus and urgency as we move toward potential approval. Our continued dialogue with the FDA remains on track with no evidence of any delays.*** We thank the patients, families, and clinicians who have been instrumental in advancing this program.

320.    The foregoing statements identified in ¶319 were materially false and misleading when made because they created the false impression that the regulatory pathway for approval of CAP-1002 was proceeding properly and in accordance with FDA standards and guidance when, in fact, it was not. Contrary to Defendants' representations that "continued dialogue with the FDA remains on track with no evidence of any delays," Capricor later admitted to receiving ***50*** information requests (IR) from the FDA during the roughly 4-month long review period and had still not resolved the CMC deficiencies identified on the Form 483 issued by the FDA. Further, as revealed later that same day, Dr. Prasad, Director of CBER, the FDA unit responsible for reviewing Capricor's BLA, had canceled the previously noticed advisory committee meeting based on reports that he was "skeptical of the treatment" so the meeting "would no longer be necessary," signaling at the very least evidence of potential delays.

*June 24, 2025*

321.  On June 24, 2025, Capricor issued a press release providing "regulatory updates related to its [BLA]" confirming, in pertinent part, that "[a]s part of the FDA's ongoing review," the agency "indicated that an Advisory Committee meeting is not required at this time." Despite this abrupt shift in the review process, Defendant Marbán is quoted as saying:

> We remain confident in the strength of our submission and continue to advance toward potential approval, with our next major step being the upcoming late-cycle review meeting. … ***To date, all regulatory milestones have proceeded as expected, including a successful pre-license inspection and a mid-cycle review with no major issues.*** Our application remains under Priority Review, and we believe we are well positioned as we move toward our PDUFA date. ***We continue to work closely with the FDA and remain encouraged by the progress of our review.***

322.  The foregoing statements identified in ¶321 were materially false and misleading when made because all regulatory milestones had not "proceeded as expected" and the PLI was not "successful."  To the contrary, regulatory meetings confirmed that the BLA lacked pivotal clinical data the FDA requested and that the FDA indicated that it did not believe that Capricor's approach provided sufficient evidence of effectiveness—both "major issues." Moreover, the PLI failed as documented in the Form 483, and many of the deficiencies identified in the Form 483 were not remediated. The concealed information substantially increased the risk that the BLA would be rejected by the FDA, a risk that was concealed from investors until it materialized. Relatedly, the above statements were materially false and misleading when made because they contradicted and concealed the high risk of delay caused by the BLA's outstanding CMC deficiencies and lack of substantial evidence of effectiveness requiring additional clinical data.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

323.    Numerous facts alleged above, viewed collectively and holistically, raise a strong inference that Defendants knew or, at minimum, were reckless in disregarding adverse facts regarding the strength of Capricor's clinical development program for CAP-1002 for the treatment of DMD and other related indications without the pivotal Phase III HOPE-3 clinical trial, the readiness of its commercial scale manufacturing facility and compliance with applicable CMC requirements, and the status of its application or the current risks it faced, and that each of the statements alleged herein were materially false and misleading and/or omitted material facts when made. In addition to the allegations set forth above, the following facts further support a strong inference of scienter.

### A.    Defendants Knew of the Fraud or Deliberately Ignored Red Flags

324.    Federal regulations require that any BLA submitted for review, whether it's seeking Accelerated Approval or Traditional (Full) Approval, must meet the same statutory standards for safety and effectiveness. As described above, for effectiveness, the standard is substantial evidence based on adequate and well-controlled clinical investigations. For safety, the standard is sufficient evidence to determine that the drug is safe for use under the conditions prescribed or suggested in the proposed labeling.

325.    Throughout the clinical development of an investigational drug product and the BLA submission and review process for any such product candidate, a company has routine meetings with the FDA. ¶¶86, 102, 113, 125, 146-47, 152-75. Indeed, Defendants affirmed that they routinely met with the FDA to discuss the Company's clinical development of CAP-1002, its path to submitting a BLA for marketing approval in the U.S., the sufficiency of the data underlying the BLA submitted, and any concerns that the FDA had. ¶¶208-09, 220-21, 236-37, 267, 269, 273, 279, 282, 284, 286, 292, 300, 303, 306, 309, 312, 319, 321.

326.    Therefore, by virtue of Capricor's meetings with FDA, Defendants had actual knowledge that agency staff: (1) considered the size of the HOPE-2 data set with only 8 patients treated with CAP-1002, relatively small; (2) was concerned about the initial analysis of the HOPE-2 clinical data which showed the trial missing its primary endpoint; (3) disagreed with Capricor's reliance on *post hoc* analysis to establish primary efficacy; and (4) would not approve the BLA for CAP-1002 without demonstration of substantial evidence of effectiveness through adequate and well-controlled studies.

327.    In addition to substantial evidence of effectiveness and a sufficient demonstration of safety, any sponsor must take responsibility for compliance with product and establishment standards when submitting a BLA and must meet all applicable CMC requirements as outlined by the FDA. Specifically, in support of a BLA, the sponsor must provide sufficient evidence to demonstrate that the methods used in manufacturing the product and the controls used to maintain the product's quality are adequate to preserve its identity, strength, quality, and purity.

328.    cGMPs state that sponsors are ultimately responsible for product quality, even when outsourcing, by ensuring manufacturers follow strict cGMP rules for facilities, processes, personnel, documentation, quality assurance and quality control systems, including by implementing and maintaining robust agreements, oversight, and strict reporting of compliance issues to authorities like the FDA. Such key areas of cGMP sponsor requirements involve proper facility design, hiring of qualified staff, well-defined standard operating procedures (SOPs), validated processes, rigorous record-keeping, deviations management, and continuous monitoring, all documented in quality agreements.

329.    As detailed above, Defendants recklessly disregarded cGMPs, FDA regulatory requirements, and other standards by submitting the CMC section of the BLA in the face of red flag warnings about substantial deficiencies at the San Diego

facility. And by virtue of Capricor's receipt of the Form 483, Defendants had actual knowledge that the CMC deficiencies were not the "minor, check-box" type.

**B.    Defendants Understood They Were Rejecting FDA Standards and Advice**

330.    Capricor's submission of a BLA seeking full approval of CAP-1002 based on existing cardiac data from the Phase II HOPE-2 clinical trial and the HOPE-2 OLE study compared to natural history data represented an extreme departure from customary practices and industry standards.

331.    As previously alleged, the FDA has interpreted the substantial evidence requirement as generally requiring data from two adequate and well-controlled clinical investigations, each convincing on its own, to establish effectiveness. While the FDA has acknowledged some regulatory flexibility in applying such statutory standards to treatments for serious diseases with unmet needs, the agency qualified such flexibility by preserving its requirements for appropriate assurance of safety and effectiveness such that, the FDA may consider data from one adequate and well-controlled clinical investigation accompanied by qualifying confirmatory evidence, but only if the FDA determines that such data are sufficient to establish effectiveness. Capricor had neither.

332.    Capricor's Phase II HOPE-2 trial was not considered an adequate and well-controlled clinical investigation. By virtue of Capricor's meetings with the FDA, Defendants knew and publicly acknowledged that the FDA considered HOPE-2 to be designed as an exploratory clinical trial, and as completed, lacked a sufficient sample size to validly compare treatment effects. Worse yet, as Defendants later admitted, on multiple occasions, the FDA raised concerns about the initial analysis of the HOPE-2 clinical data, the results of which concluded that the study failed in showing the intended effect on the prespecified primary

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

endpoint, and in pertinent part, and its surrogate cardiac endpoint of LVESV, indexed.

333.    The HOPE-2 OLE study was designed as an unblinded, single-arm extension providing real-world evidence of effectiveness. By definition, the HOPE-2 OLE study does not qualify as an adequate and well-controlled clinical investigation. Capricor's later statistical analysis of HOPE-2 OLE data compared to natural history data did not make the OLE study a qualifying registration study.

334.    Notwithstanding the foregoing, Defendants touted their decision to proceed with the BLA based on existing cardiac data and natural history data by suggesting it had emanated from dialogue with the FDA, when it had not, and promoted the Company on that basis while at the same time concealing from investors the excessive regulatory risks their approach created. Defendants' statements led investors to believe that the BLA submission seeking full approval of CAP-1002 for the treatment of DMD-associated cardiomyopathy based on existing cardiac data from HOPE-2 and HOPE-2 OLE studies compared to natural history data was aligned with FDA views when, in fact, it was not. Defendants concealed material adverse information from investors, *i.e.,* the risks associated with the BLA lacking substantial evidence of effectiveness, in the hope that it would be overshadowed by good news, *i.e.*, successful Phase III HOPE-3 trial results. The Individual Defendants' actions in this regard amounted to a knowing and deliberate reckless gamble.

## C.    Capricor Needed to Submit a BLA and Raise Capital to Survive

335.    For Defendants' gamble to pay off, Capricor needed an influx of money to sustain operations long enough to carry the Company through the combination of Cohort A and Cohort B of the Phase III HOPE-3 trial.

336.    Defendants were financially motivated to misrepresent the truth and artificially inflate the market price of Capricor stock. Capricor desperately needed

cash to survive, which they intended to raise by selling stock. In its SEC filings issued just before the Class Period, the Company projected that based on its available cash resources and projected operations, the Company did not have sufficient cash on hand to support current operations for at least the next twelve months, as of August 8, 2024.

337.    Capricor filed with the SEC Registration Statement No. 333-280229, deemed effective on October 16, 2024, for the October 2024 Offering. The offering's Prospectus Supplement incorporated by reference the Current Report on Form 8-K filed with the SEC on October 9, 2024 (Item 8.01 and associated Item 9.01 only) which attached as Exhibit 99.1, the October 9 Press Release containing the materially false and misleading statements alleged herein.

338.    Capricor's need for working capital and, in turn, the need to maintain a successful image with investors provided Defendants with motive and opportunity to commit the fraud alleged herein.

339.    Given Capricor's precarious financial position as a clinical-stage biotechnology company with no approved products, this motive surpassed any ordinary or generic corporate motive to raise funds.

D.    **Defendant Marbán Publicly Affirmed her Knowledge of Concealed Adverse Information by (Falsely) Answering Questions from Analysts About Such Matters**

340.    Defendant Marbán spoke publicly and in detail about Capricor's communications with the FDA regarding the San Diego manufacturing facility, the HOPE-2 data set, the HOPE-3 clinical trial, and Capricor's BLA, in some instances specifically referencing her personal attendance at FDA meetings. *See* ¶¶164, 166, 173-74, 208-09, 237, 256-59, 269, 273, 275, 277, 279, 286, 288, 292-93, 297, 306, 309, 313-14, 319, 321. Indeed, Ms. Marbán knew investors and analysts were acutely interested in Capricor's DMD program and its regulatory approval pathway

for CAP-1002 and the necessary data to support such approval because she was repeatedly asked about such key operations throughout the Class Period, and responded to specific, pointed questions from analysts. *See* ¶¶275, 288, 297.

341.   By making public statements and responding to securities analysts about these issues, Defendant Marbán affirmed that she was sufficiently knowledgeable to address these topics and to answer the analysts' questions, which further supports a strong inference that she knew or recklessly disregarded the true facts concerning these matters.

**E.    <u>Defendants' Materially False and Misleading Statements Concerned Capricor's Core Operations</u>**

342.   Defendants' scienter is also strongly inferable because their materially false and misleading statements concerned the clinical development of CAP-1002, Capricor's lead product candidate, and the BLA deficiencies can be inferred because these facts were critical to Capricor's core operations. As depicted in the chart below, CAP-1002 was, at all relevant times, Capricor's primary asset, as all other drugs in Capricor's pipeline are investigational and have yet to reach the clinical development stage, let alone be licensed for widespread use:



AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

343.   Moreover, the CMC issues at the Company's San Diego facility, its only commercial scale manufacturing facility, directly impacted the CAP-1002 product and its BLA approval. *See* ¶¶146-47, 165, 177, 180, 187-206, 288, 312. Furthermore, CAP-1002's progress and the submission of its BLA were directly tied to much needed cash infusions for the Company through both its October 2024 Offering and its deal with Nippon. *See* Section VI(C), *supra*; *see also* ¶¶238-52. Accordingly, that Defendants' misrepresentations all concerned the most critical drug product in the Company's history supports a strong inference that Defendants knew about the BLA efficacy deficiencies and CMC deficiencies stemming from the San Diego facility's cGMP non-compliance, or at least, recklessly disregarded these matters.

### F.      Defendant Marbán's Substantial Experience in Biotechnology

344.   Defendant Marbán's over two decades of experience in the biotechnology field, which include business development and scientific management for drugs looking to gain FDA approval, further supports her scienter. As a longtime senior executive in the biotechnology industry, including serving as the Vice President of Business Development and Vice President of Operations at Excigen, Inc., there is a strong inference that Defendant Marbán would know about the risks associated with CAP-1002's BLA submission seeking full approval based on existing cardiac data from HOPE-2 and HOPE-2 OLE compared to natural history data, the concerns communicated to her by the FDA about demonstrating substantial evidence of effectiveness, and the compliance issues at the San Diego facility, which were communicated to her in meetings with other Capricor executives and by the FDA through the Form 483. *See* ¶¶28-30, 162-66, 189-206, 216, 223-35, 258-61. Defendant Marbán, therefore, knew or recklessly disregarded the adverse facts contradicting her and Capricor's public statements detailed above.

## VII.    LOSS CAUSATION AND ECONOMIC LOSS

345.    During the Class Period, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Capricor's common stock and operated as a fraud or deceit on Class Period purchasers of Capricor's common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Capricor's common stock materially declined, as the prior artificial inflation came out of the Company's share price over time. As a result of their purchases of Capricor's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

346.    As alleged *supra*, the truth concerning the deficiencies of Capricor's BLA and the risks associated therewith ultimately materialized through a series of partial disclosures, including revelations contained in a *Stat News* report issued on June 20, 2025, and direct admissions and revelations by Capricor on July 11, 2025. Capricor's stock price fell precipitously in response to these alleged corrective events.

347.    For example, on June 20, 2025, mere hours after the Company issued a press release misleadingly touting positive 4-year data from HOPE-2 OLE and Defendant Marbán declaring "continued dialogue with the FDA remains on track with no evidence of any delays," *Stat News* reported that Dr. Prasad, Director of CBER, the FDA unit responsible for reviewing Capricor's BLA, had canceled the previously noticed advisory committee meeting based on reports that he was "skeptical of the treatment" so the meeting "would no longer be necessary."

348.    *MSN Money* issued an article on June 20, 2025 entitled, "Capricor falls after report on AdCom meeting cancellation," reporting Capricor's share price "plunged 32% following a trading halt on Friday after *Stat News* reported that the

new head of the FDA unit responsible for biologic drugs has canceled an advisory committee meeting scheduled to review the company's lead asset, Deramiocel." The article went on to note that, "[a]ccording to people familiar with the matter," the meeting was "unilaterally canceled by Dr. Prasad, who was uncertain about the drug's efficacy and safety."

349.   Analysts, likewise, reacted sharply to this news. For example, on June 22, 2025, Oppenheimer & Co Inc. issued a "company update" for Capricor and lowered its price target ("PT"), summarizing that, "[f]ollowing Friday's STAT article … we do not expect this candidate to be approved for Duchenne cardiomyopathy in its current cycle (8/31 PDUFA)." The report went on to note:

> Should a complete response be issued, we anticipate that CAPR will revert to what had been its plan prior to last fall's regulatory upside surprise—pursuit of approval to mitigate skeletal muscle function decline in ambulant and non-ambulant DMD patients, as predicated on results from a recently-completed, but still blinded, Phase 3 trial that we see as derisked by prior studies. We have revised our model accordingly and lower our PT to $22 (from $43).

350.   Consequently, on this news, the price of Capricor's common stock dropped significantly from $11.94 per share at close on the preceding trading day, June 18, 2025, to $8.26 per share at close on June 20, 2025, before declining even further to $7.68 at close on the following trading day, June 23, 2025, representing a 35.7% decline in value over two trading days.

351.   Then, during pre-market hours on July 11, 2025, Capricor issued a press release announcing it had received a CRL from the FDA denying the BLA specifically citing it did not meet the statutory requirement for substantial evidence of effectiveness and the need for additional clinical data. Further, the CRL referenced outstanding items in the CMC section of the application.

352.   *Seeking Alpha*, an industry-leading financial research platform, issued an article on July 11, 2025 entitled, "Capricor shares drop after FDA issues

complete response letter for lead DMD therapy," reporting that Capricor's "shares fell Friday after the company announced it received a complete response letter from the [FDA] for its [BLA] for Deramiocel, its lead cell therapy candidate for treating cardiomyopathy in [DMD] patients." The article went on to note, "Capricor [], down 50% premarket, plans to engage further the FDA to determine the appropriate next steps," including "plans to resubmit its BLA to include data from the ongoing Phase 3 HOPE-3 trial in Q3 2025 to continue pursuing the indication for the treatment of cardiomyopathy associated with [DMD]."

353. Analysts similarly reacted sharply to Capricor's revelations about the CRL, including its admissions of longstanding CMC issues and the insufficiency of HOPE-2 trial and open label extension data to support a BLA. For example, Cantor Fitzgerald lowered its price target calling the CRL issuance a "disappointing setback" noting that "[i]t's unclear if a brand-new BLA will be required…or a major amendment."

354. Piper Sandler also lowered its price target noting the delay in FDA approval to 2026 stating that "[w]e anticipate FDA will deem this a Class II resubmission with a 6-month review period, and that deramiocel could gain FDA approval in mid'26."

355. Consequently, on this news, the price of Capricor's common stock declined swiftly from a closing market price of $11.40 per share on July 10, 2025 to $7.64 per share at close on July 11, 2025, representing a 33% decline in value in a single trading day.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## VIII.  PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

356.  At all relevant times, the market for Capricor's common stock was an efficient market for the following reasons, among others:

(a)  Capricor's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)  Capricor communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)  Capricor was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)  Unexpected material news about Capricor was reflected in and incorporated into the Company's stock price during the Class Period.

357.  As a result of the foregoing, the market for Capricor's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Capricor's stock price. Under these circumstances, all purchasers of Capricor's common stock during the Class Period suffered similar injury through their purchase of Capricor's common stock at artificially inflated prices, and a presumption of reliance applies.

358.  Alternatively, reliance need not be proven in this action because the action involves primarily omissions rather than affirmative misstatements. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United

States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## IX.    NO SAFE HARBOR

359.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with statements about regulatory developments and prospects while at the same time omitting acute risks undermining the validity of their statements.

360.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

361.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Capricor who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts

made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## X.    CLASS ACTION ALLEGATIONS

362.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Capricor's common stock during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendant's immediate family and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

363.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Capricor's common stock were actively traded on the NASDAQ. Capricor's Form 10-K dated March 26, 2025 states that "we had 133 holders of record of common stock, which does not include holders who held in 'street name' or beneficial holders, whose shares are held of record by banks, brokers and other financial institutions."  Industry practice confirms that the holders in street name are generally several times higher than those of record.  Therefore, while the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several hundred, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Capricor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 13, 2025, there were 45 million shares of the Company's common stock outstanding.

364.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

365.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

366.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Capricor;

    (c)   whether the Individual Defendant caused Capricor to issue false and misleading financial statements during the Class Period;

    (d)   whether Defendants acted knowingly or recklessly in issuing materially false and misleading statements;

    (e)   whether the prices of Capricor's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    (f)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

367.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the

proposed Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of Section 10(b) of*
### *the Exchange Act and Rule 10b-5 Promulgated Thereunder*

368. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

369. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

370. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Capricor common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Capricor's securities at artificially inflated prices. In furtherance of this

1  unlawful scheme, plan and course of conduct, Defendants, and each of them, took
2  the actions set forth herein.

3       371.   Pursuant to the above plan, scheme, conspiracy and course of conduct,
4  each of the defendants participated directly or indirectly in the preparation and/or
5  issuance of the quarterly and annual reports, SEC filings, press releases and other
6  statements and documents described above, including statements made to securities
7  analysts and the media that were designed to influence the market for Capricor's
8  securities. Such reports, filings, releases and statements were materially false and
9  misleading in that they failed to disclose material adverse information and
10  misrepresented the truth about the Company.

11       372.   By virtue of her position at the Company, the day-to-day authority she
12  exercised, and her knowledge of actual regulatory communications, the Individual
13  Defendant had both access to and actual knowledge of the truthful information
14  concealed by Defendants' materially false and misleading statements and material
15  omissions alleged herein and intended thereby to deceive Plaintiffs and the other
16  members of the Class, or, in the alternative, she acted with reckless disregard for
17  the truth by failing or refusing to ascertain and disclose such facts as would reveal
18  the materially false and misleading nature of the statements made, although such
19  facts were readily available to her. Said acts and omissions were committed
20  willfully or with reckless disregard for the truth. Her knowledge is imputed under
21  law to the corporate Defendant.  In addition, both the corporate Defendant and the
22  Individual Defendant knew or recklessly disregarded that material facts were being
23  misrepresented or omitted as described above.

24       373.   Information showing that Defendants acted knowingly or with
25  reckless disregard for the truth is peculiarly within defendants' knowledge and
26  control. As a chief executive and director of the Company, and the person
27  describing the Company's regulatory approach and CMC readiness to investors and
28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

analysts, the Individual Defendant had knowledge of the details of the concealed information and actual content of Capricor's regulatory communications and CMC deficiencies.

374.   The Individual Defendant is liable both directly and indirectly for the wrongs complained of herein. Because of her positions of control and authority, the Individual Defendant was able to and did, directly or indirectly, control the content of the statements of the Company. As an officer and director of a publicly-held company, the Individual Defendant had a duty to disseminate timely, accurate, and truthful information with respect to Capricor's business, operations, and prospects, including its regulatory communications and CMC readiness. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Capricor's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Capricor's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

375.   During the Class Period, Capricor's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Capricor's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases

and/or acquisitions by Plaintiffs and the Class, the true value of Capricor's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Capricor's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

376.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

377.   As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendant*

### *for Violations of Section 20(a) of the Exchange Act*

378.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

379.   During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of her senior positions, the Individual Defendant knew the adverse non-public information about Capricor's omissions and affirmative misstatements.

380.   As an officer and director of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Capricor which had become materially false or misleading.

381.   Because of her positions of control and authority as Capricor's most senior officer, which she did exercise on a day-to-day basis, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which Capricor disseminated in the marketplace during the Class Period, including the misrepresentations and omissions alleged herein. Throughout the Class Period, the Individual Defendant exercised her power and authority to cause Capricor to engage in the wrongful acts complained of herein. The Individual Defendant, therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, she participated in the unlawful conduct alleged, which artificially inflated the market price of Capricor's common stock.

382.   The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of her positions as a senior manager and director of the Company, the Individual Defendant had the power to direct the actions of, and exercised the same to cause, Capricor to engage in the unlawful acts and conduct complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

383.   By reason of the above conduct, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by the Company.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XII.    DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

*[Signature blocks on following page]*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: January 19, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam Apton*
Adam M. Apton (SBN 316506)
Devyn R. Glass
(*pro hac vice* application forthcoming)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
aapton@zlk.com
dglass@zlk.com

**POMERANTZ LLP**
Joshua B. Silverman (*pro hac vice*
application forthcoming)
Christopher P.T. Tourek (*pro hac vice*)
Genc Arifi (*pro hac vice*)
10 S. LaSalle St., Ste. 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
jbsilverman@pomlaw.com
ctourek@pomlaw.com
garifi@pomlaw.com

*Attorneys for Lead Plaintiffs and Co-Lead
Counsel for the Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy, Esq.
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Moussa
Yeroushalmi*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS